**CENTRAL MAINE POWER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION,
et al.**

Supreme Judicial Court of Maine.

Aug. 6, 1979.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Gerald M. Amero (orally), James E. Purcell, Portland, Seward B. Brewster, Augusta, for Central Maine Power.

Blodgett & McCarren by V. Louise McCarren (orally), Burlington, Vt., Paul A. Fritzsche, Pine Tree Legal Assistance, Inc., Lewiston, for Maine Committee for Utility Rate Reform, the Consumer Action Coalition, and Bruce M. Reeves.

Frederick S. Samp (orally), Cushing W. Pagon, Horace S. Libby, Stephen A. Johnson, Public Utilities Commission, Augusta, for the Public Utilities Commission.

Fitzgerald, Donovan, Conley & Day by Mark L. Haley (orally), Bath, for the Maine Oil Dealers Ass'n.

Peggy Wells Dobbins (orally), Legal Dept., St. Regis Paper Co., New York City, Perkins, Thompson, Hinckley & Keddy by Thomas Schulten, Portland, for St. Regis Paper Co.

Edward Lee Rogers (orally), Augusta, for Natural Resources Council.

Before POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

POMEROY, Justice.

On January 16, 1978, Central Maine Power Company,[1] pursuant to 35 M.R.S.A. § 64, filed with the Public Utilities Commission [2] a revised schedule of rates and certain re-

---

1. Hereinafter sometimes referred to as CMP, Central Maine, or the Company.

2. Hereinafter sometimes referred to as the Commission, or the PUC.

vised rules and regulations to become effective on February 15, 1978. This filing operated as a proposal to increase rates to its customers. If effective, revenues would be increased by 12.5% or $24,700,000 annually.

Pursuant to 35 M.R.S.A. § 69 the Commission, by Order dated February 13, 1978, suspended the proposed rates for a period of three months from February 15, 1978, in order to conduct public hearings. On May 12, 1978, the Commission entered *"Suspension Order No. 2"* suspending the filed schedules for an additional five-month period from May 15, 1978.

On January 26, 1978 the Commission began processing the schedules, and, pursuant to Commission order, direct testimony was pre-filed by CMP, the Commission Staff, and various intervenors. At a March 14, 1978 Prehearing Conference petitions to intervene and other procedural matters were presented. Ten such petitions were granted by Order of March 17, 1978. Four of those intervenors have participated in this appeal: St. Regis Paper Company, the Consumer Coalition,[3] Maine Oil Dealers Association (MODA) and ten individual complainants, and the Natural Resources Council of Maine.[4] The reaction of Central Maine to the participation of MODA presents special issues.

On February 9, 1978 MODA and ten individuals, all oil dealers and customers of CMP, filed a complaint with the Commission against CMP's rates filed on January 16, 1978 in Docket F.C. # 2332. Jurisdiction was alleged under 35 M.R.S.A. § 291. The MODA complaint was docketed as F.C. # 2336. CMP filed an answer and motion to dismiss the complaint on February 28, 1978. MODA moved on March 7, 1978 to consolidate its complaint (F.C. # 2336) with the pending rate proceeding (F.C. # 2332).

By its March 17, 1978 Order the Commission denied CMP's motion to dismiss the MODA complaint and granted MODA's motion to consolidate. MODA's petition to intervene in the pending rate case was also granted. Central Maine thereupon filed a complaint on April 14, 1978 with the Superior Court requesting injunction and declaratory relief, and relief in the nature of prohibition, alleging jurisdiction under Rule 80B, M.R.Civ.P. The Commission filed a motion to dismiss CMP's complaint, as did MODA and the ten individual defendants. CMP moved for summary judgment. Oral arguments were heard on July 3, 1978, and by Order dated July 6 the Presiding Justice granted the motions to dismiss the 80B complaint for lack of jurisdiction. Central Maine filed a Notice of Appeal from this dismissal with this Court on August 4, 1978, which appeal was designated Docket No. Ken–78–42.

After public notice, 26 days of hearings were held in Central Maine's rate case (F.C. # 2332), during which time the Company, the Commission Staff, and all intervenors choosing to do so participated in the presentation of direct cases and cross-examination. Twenty-one witnesses introduced some one hundred sixteen exhibits into evidence. Additionally, some ninety-four public participants testified, gave statements, and presented twelve exhibits. A total of some 4,670 pages of testimony was generated. Hearings concluded on August 9, 1978, whereupon briefs were filed and oral argument heard on September 7, 1978. The Commission entered its decision on October 13, 1978 (hereinafter the *"Decree"*).

The Decree disallowed the schedule of rates filed by CMP on January 16, 1978 designed to produce approximately 25 million dollars in additional revenues, and sub-

---

3. The Consumer Coalition was referred to as the Reeves Group in the March 17 Order, and consists of Bruce M. Reeves, the Maine Citizens Committee for Utility Rate Reform and the Consumer Action Coalition. Hereinafter they will be referred to as the Consumer Action Coalition, or the Consumer Coalition.

4. Others granted intervenor status were Martin-Marietta Corporation, Keyes Fibre Company, Scott Paper Company, Common Cause, the China Library Association, *et al.*, and the Maine Municipal Association (with the Town of Farmington and the Town of Litchfield). The Maine Municipal Association and the towns were allowed to withdraw by Order of April 25, 1978.

stituted approval of a two-step increase to produce additional revenues of $15,528,000. CMP thereupon filed substitute schedules on October 1, 1978 and December 1, 1978 designed to produce additional revenues of $6,276,000 and $9,252,000 respectively. These filings were approved by Commission Supplemental Order Nos. 1 and 2 dated October 31 and December 5, 1978, respectively.

Petitions for rehearing filed by various intervenors were denied by Commission orders dated October 31 and November 16, 1978.

In addition to its complaint pursuant to 35 M.R.S.A. § 305 (the § 305 complaint) filed November 2, 1978 (see *post*), CMP and several intervenors filed appeals pursuant to 35 M.R.S.A. § 303 (the § 303 appeals) on or after November 9, 1978 with respect to the Commission's Decree and Supplemental Orders.[5]

Pursuant to 35 M.R.S.A. § 305, the Company on November 2, 1978, by motion filed with the Acting Chief Justice sought to stay the Commission's Decree and Supplemental Order of October 31, 1978 insofar as they precluded CMP from collecting rate revenues beyond those authorized by that Decree and Order.[6] Following oral argument, the motion was denied by decision and order dated November 10, 1978.

By Procedural Order dated January 15, 1979, this Court consolidated in Law Court Docket No. Ken–78–52 CMP's § 305 complaint, its appeal from the Superior Court dismissal of its Rule 80B complaint (formerly Ken–78–42) and the § 303 appeals taken by CMP and all intervenors from the Commission's Decree and Orders. In addition, the Order established a division of issues for purposes of submission of briefs and appendices. Issues concerning revenue requirements and CMP's Superior Court appeal were designated "*Part 1*" issues, and issues concerning rate design were designated "*Part 2*" issues. By a subsequent Procedural Order, dated April 12, 1979, similar provision was made for a division of issues for presentation at oral argument.

A brief outline of the issues presented by the consolidated appeal, and the position of the parties with respect to each, will be useful at this point.

(1) Central Maine Power Company is:

(a) an appellant with respect to its appeal from the Superior Court order dismissing its Rule 80B complaint.

(b) a § 305 plaintiff and a § 303 appellant with respect to Commission action concerning these issues:

(i) denial of its motion to dismiss MODA's complaint under 35 M.R.S.A. § 291, and allowance of MODA's motion to consolidate and petition to intervene. ("*The MODA participation issue*").

(ii) exclusion from rate base of depreciation expense on plant financed by deferred taxes ("*the deferred tax issue*").

(iii) reduction of CMP's test year revenue requirements by an amount equal to the discount provided employee and retirees ("*the employee discount issue*").

---

5. CMP filed a § 303 appeal on November 9 from the Commission's Decree of October 13 and its Supplemental Order No. 1 of October 31; it extended that appeal to embrace Supplemental Order No. 2 of December 5 by notice of appeal on December 12. Notice of appeal dated November 15 from the Commission's Decree and notice of appeal dated December 22 from the Decree and from the Commission's orders of October 31 and December 5 were filed by the Consumer Coalition. St. Regis Paper Company and the Natural Resources Council of Maine, *et al.* filed notices of appeal dated November 21 and 22, 1978 respectively.

6. CMP sought to collect additional revenues of $889,000 representing the "*Maine jurisdictional*" portion of (a) depreciation expense on plant financed by deferred taxes disallowed by the Commission as a rate expense ($641,500), and (b) the reduction to the Company's revenue requirements made by the Commission equal to the discount provided CMP employees on their electric service ($247,500). While finding "*a reasonable likelihood*" of Commission error with respect to both these deferred tax and employee discount issues, the order concluded that the Company had failed to demonstrate the prospect of "*irreparable injury*" within the meaning of § 305.

(iv) use of a capital structure with a 35% common equity ratio to determine the Company's revenue requirements, in lieu of the Company's *pro forma* ratio of 35.2%. (*"the capital structure issue"*).

(c) an appellee with respect to the appeals taken by the intervenors, relating principally to issues of rate design (*"Part 2 issues"*), but including the revenue requirement (*"Part 1"*), issue of the Commission treatment of its Land Held for Future Use and associated accounts, raised by the Consumer Coalition.

(2) The Public Utilities Commission is a § 305 defendant with respect to CMP's § 305 complaint, and an appellee with respect to all § 303 appeals presented by CMP and by intervenors.

(3) The Maine Oil Dealers Association and ten individual complainants are appellees with respect to CMP's appeal from the Superior Court dismissal of its Rule 80B complaint, and with respect to issues of the intervention and consolidation ordered by the Commission in the rate case below.

(4) St. Regis Paper Company is a § 303 appellant with respect to the Part 2 (rate design) issue concerning the propriety of the Commission's allocation on a uniform basis to all customer classes of the rate increases permitted by its Supplemental Orders (*"the uniform percentage increase issue"*).

(5) The Consumer Coalition is a § 303 appellant with respect to the Part 1 (revenue requirement) issue concerning the Commission's inclusion in rate base of certain CMP properties held for future use (*"the land held for future use issue"*), and with respect to the Part 2 (rate design) issue of the Commission's approval of a $5.70 residential monthly customer charge (*"the customer charge issue"*). While not a designated § 305 defendant, it submits an argument in support of the Commission's position with respect to the employee discount issue.

(6) The National Resources Council of Maine, *et al.*, is a § 303 appellant with respect to the customer charge issue, and with respect to the Part 2 (rate design) issue of the Commission's rejection of implementation of seasonally-differentiated rates in the residential class (*"the seasonal rate issue"*).

We reach the following conclusions as detailed within:

(1) We sustain CMP's appeal from the Commission's denial of its motion to dismiss MODA's § 291 complaint, and accordingly from the consolidation of that complaint with the pending rate case;

(2) We deny CMP's appeal from the Commission's grant of intervenor status to MODA, finding no abuse of the Commission's discretion;

(3) We deny CMP's appeal from the Superior Court order dismissing its 80B complaint for lack of jurisdiction, finding it moot;

(4) We sustain CMP's appeal with respect to the deferred tax issue and the employee discount issue and remand for appropriate adjustments;

(5) We deny CMP's appeal with respect to the capital structure issue;

(6) We deny the Consumer Coalition's appeal with respect to the Land Held for Future Use issue, finding it not to have been appropriately raised before and considered by the Commission;

(7) We reach no decision on St. Regis Paper Company's appeal with respect to the uniform percentage increase issue, finding that our decisions respecting CMP's revenue requirements necessitate the filing of new schedules, which in turn may moot the issue in any of several respects;

(8) We deny the appeals of the Consumer Coalition and the Natural Resources Council with respect to residential rate design, i. e., the customer charge and seasonal rate issues, finding the Commission action to have been reasonable and supported by substantial evidence.

## I.

## MODA PARTICIPATION ISSUES

On February 9, 1978, MODA and ten residential customers of Central Maine filed a complaint with the Commission, allegedly based upon 35 M.R.S.A. § 291, challenging as unjust and discriminatory the proposed rates filed with the Commission by Central Maine Power on January 16, 1978 (*"the CMP rate case"*). The § 291 Complaint was designated Docket F.C. # 2336, in contradistinction to the Central Maine Power rate case, Docket F.C. # 2332. The § 291 Complaint alleged no jurisdictional basis other than 35 M.R.S.A. § 291. Subsequently, on March 17, 1978, the Commission (a) granted a March 7, 1978 motion by MODA to consolidate its § 291 complaint with the pending rate case, (b) denied a February 28, 1978 CMP motion to dismiss MODA's § 291 complaint, and (c) granted MODA intervenor status in the rate case.

The Commission erred in denying CMP's motion to dismiss the § 291 complaint and in allowing its consolidation with the pending rate case. It did not err in allowing MODA's petition to intervene.

### A. The § 291 Complaint and Consolidation

In its Order on Pre-hearing Conference, the Commission concluded, after a brief discussion of the legislative history of 35 M.R.S.A. §§ 69 and 291 and their predecessor provisions, that

> *any 10 persons, firms, corporations, or associations aggrieved may file a complaint against proposed rates of a public utility under Sections 69 and 291. Central Maine Power Company's Motion to Dismiss the Complaint in F.C. # 2336 is denied.*

We sustain Central Maine's appeal from the denial of this motion.

Section 291 states in relevant part:

> *Upon written complaint made against any public utility by 10 persons, firms, corporations or associations aggrieved, that any of the rates, tolls, charges or schedules or any joint rate or rates of any public utility are in any respect unreason-*

*able or unjustly discriminatory . . . the commission, being satisfied that the petitioners are responsible and that a hearing is expedient, shall proceed with or without notice to make an investigation thereof. . . .*

■ It is a universally recognized principle of statutory construction that legislative intent must first be sought in the plain meaning of words used in the statute. *State v. Hussey*, Me., 381 A.2d 665 (1978). Where the statutory language is plain and unambiguous, there is no occasion for resort to rules of statutory interpretation to seek or impose another meaning. *State v. Millett*, Me., 392 A.2d 521 (1978).

■ The plain meaning of § 291 is that a complaint under that section may be filed solely with regard to *existing* rates: the complaint is to be made against rates which *"are in any respect unreasonable,"* by persons *"aggrieved"* by them. Proposed rates are not rates within the meaning of § 291. Though they will become effective if not acted upon by the Commission in a timely fashion, 35 M.R.S.A. § 64, they are initially inchoate, having only potential effect. Like the first bid made at an auction, they are simply the starting point for a process which may yield a far different final result. The statute does not allow complaints against *"rates"* which *"would be"* unreasonable, but only those which *"are."* A clearer indication that the Legislature intended to refer only to existing and effective rates is difficult to conceive. So, too, it is difficult to believe that ten persons can be *"aggrieved"* by proposed rates, which have no substantive effect. *Compare, Heald v. School Administrative Dist. No. 74*, Me., 387 A.2d 1 (1978); *Matter of Lappie*, Me., 377 A.2d 441 (1977).

In addition, § 292, requiring the Commission to set a hearing if, after seven days' notice *"such public utility shall not have removed the cause of complaint . . ."* suggests that the complaint process is intended to provide a vehicle for filing grievances against existing practices. It seems highly unlikely that, if the cause of com-

plaint is the proposed rates, the utility may be expected to withdraw or revise the schedules within seven days. Moreover, the availability of such a mechanism, which *requires* the Commission to hold a hearing, would go far toward rendering the § 69 discretionary hearing process a dead letter.

In our decisions in *New England Tel. & Tel. Co. v. Public Utilities Commission*, Me., 354 A.2d 753, 757 (1976) and *New England Tel. & Tel. Co. v. Public Utilities Commission*, Me., 362 A.2d 741, 747–48 (1976) we spoke of the use of § 291 to investigate *"a currently effective rate"*, and *"rates and charges then in effect."* The Commission concedes that in 1913, when the basic structure of our utility regulatory scheme was promulgated, the predecessor of § 291 applied solely to existing rates. It contends, however, that the 1917 enactment of the predecessor of § 69 incorporated by reference the § 291 complaint mechanism with respect to proposed rates.[7]

Section 69 refers to a *"complaint"* twice, stating in relevant part:

> Whenever the Commission receives a notice of any change or changes proposed to be made in any schedule of rates filed with said Commission under the provisions of law, it shall have power at any time before the effective date of such change or changes, either upon complaint or upon its own motion and after reasonable notice, to hold a public hearing and make investigation as to the propriety of such proposed change or changes. At any such hearing . . . the burden of proof to show that such change is reasonable shall be upon the public utility. After such hearing and investigation, the Commission may make such order with reference to any new rate, joint rate, fare, rental, toll, classification, charge, rule, regulation or form of contract or agreement proposed as would be proper in a proceeding initiated upon complaint or upon motion of the Commission in any rate investigation. (Emphasis added).

In the first sentence, the Commission is said to have the *power*, upon *"complaint"* to hold a public hearing. However, § 292, implementing § 291, *requires* the Commission to hold such a hearing if the cause of the (§ 291) complaint is not timely removed. One suggestion that the first reference to *"complaint"* cannot mean a § 291 complaint must thus be noted. Later in the section, the Commission is empowered, in a § 69 proceeding, to make such order *"as would be proper in a proceeding initiated upon complaint."* Obviously, a § 69 proceeding cannot be one *"initiated upon complaint"* if that reference is not to be meaningless. The section does not refer to itself.

■ The only logical construction which may be placed upon these references to *"complaint"* is that the second reference (to *"a proceeding initiated upon complaint")* is to § 291, the effect of which is to incorporate into § 69 the *order* provisions of § 294 (entered in a § 291 investigation), to be exercised *"[a]fter such [§ 69] hearing and investigation."* The first reference to *"complaint"*, authorizing but not requiring a hearing, cannot mean § 291, but must envision simply a request that an investigation be made after the proposed rates have been filed by the utility.[8] Unlike the case of a § 291 complaint, a hearing need not be held though the utility shows no intention

---

**7.** It should be noted here that MODA's § 291 complaint did not allege § 69 as a jurisdictional basis, preferring to claim jurisdiction exclusively on the basis of § 291. Since the Commission concedes that § 291 itself applies only to existing rates, we consider the issue indulging in the assumption that an allegation of § 291 jurisdiction incorporates reliance on § 69 as well.

**8.** We agree with the Commission that the mere filing of rates does not *necessarily* initiate a § 69 proceeding, since the Commission may simply allow them to take effect following the § 64 30-day period. However, such filing is *necessary* (if not sufficient) to initiate a § 69 proceeding, and in that sense it can be said to be initiated by the utility. *New England Tel. & Tel. Co. v. Public Utilities Commission*, Me., 354 A.2d 753, 761–62 (1976). In any event, it does not follow that *"upon complaint"* in § 69 means *"upon § 291 complaint."* The crucial truth remains that *"proceeding initiated upon complaint"* in that section makes sense only if understood to refer to a § 291 complaint.

of removing the cause for complaint, i. e., the proposed rates. The Commission may simply allow them to take effect, leaving open the § 291 remedy of a complaint against *existing* rates.

Our discussion of the meaning of § 69 in *New England Tel. & Tel. Co. v. Public Utilities Commission*, Me., 354 A.2d 753 (1976) supports this view. The Commission cites that opinion, 354 A.2d at 762, n.5 in support of its position, quoting our holding that

> *Essentially, Section 69 is concerned with the power of suspension that Section 69 confers upon the Commission. Its thrust, therefore, is basically to adapt to the suspension power the Commission's investigational and decisional methodology as operative under a Section 291 ("10 persons complaint")* or a Section 296 (Commission's "own" motion) proceeding.

Notably, we held the section to *"adapt"* —rather than *wholly* incorporate—§§ 291 and 296 investigational and decisional methodology. We did, in the same footnote, hold that

> *In this manner Section 69 is really in-corporating, by reference, the "order" provisions of Section 294 (as the order "properly" entered in a Section 291, Section 296 or Section 298 rate investigation) i. e., an order requiring that the utility "substitute" for the changed schedule of permanent rates initially placed on file under Section 64 the changed schedule of permanent rates determined by the Commission, after investigation, to be just and reasonable.* 354 A.2d at 762, n.5. (Emphasis added).

We nowhere held § 69 to incorporate, as part of *"investigational and decisional methodology,"* the complaint mechanism of § 291, a conclusion which would have been plainly contrary to statutory language (particularly the second reference to *"complaint"* in § 69) and to the entire statutory scheme.

A § 291 complaint may only be brought with respect to existing rates. The Com-

mission therefore erred in denying CMP's motion to dismiss, and in consolidating the improperly allowed action with the pending rate case.[9] On remand, the Commission is ordered to dismiss MODA's § 291 complaint for lack of jurisdiction.

**B. The Rate Case Intervention**

On February 17, 1978, MODA, on behalf of itself and as representative of its individual ratepayer members, filed with the Commission its petition to intervene in F.C. # 2332, the CMP rate case. The petition was granted by a majority of the Commission in its order of March 17, 1978.

The Commission urges that we not reach the merits of this issue, contending that because MODA has not appealed, no live controversy exists for our adjudication.

While we agree that Central Maine has failed to show prejudice resulting from MODA's intervention below, and that we can offer no present remedy should we find error, we nevertheless find the issue justiciable. We consider a claim of an improper grant of intervenor status by the Commission to be

> a claim of right buttressed by a sufficiently substantial interest to warrant judicial protection . . . assert[ed] . . . against a defendant having an adverse interest in contesting it . . . . *Jones v. Maine State Highway Commission*, Me., 238 A.2d 226, 228–29 (1968).

The increase in costs and time which may be prompted by widespread intervention require that the propriety of such grants be reviewable regardless of the presence of the intervenor as a party on appeal. At such stage it is the Commission, not the intervenor, who occupies the status of a defendant possessing an adverse interest, i. e., the protection of its powers to grant intervention on the grounds relied upon and there contested. To deny a right to challenge such decisions would present serious due process questions; we hold such a controversy to be justiciable even absent the party whose intervention is complained of.

---

9. One Commissioner dissented from the granting of the motion to consolidate, having also dissented from the grant of intervenor status in the rate case to MODA itself.

Commission Rule 16.1 restricts intervenor status to those *"directly and substantially affected by the proceeding."* In *Central Maine Power Co. v. Maine Public Utilities Commission,* Me., 382 A.2d 302, 312 (1978) we observed that the Rule constitutes a *"reasonable and in fact a necessary requirement if the Commission is to hear and determine the cases before it promptly and effectively."* We held in that case, decided only weeks before the Commission's action complained of here, that MODA had erroneously been granted intervenor status in that rate proceeding. There, however, MODA *"sought intervenor status on the basis, fundamentally, that the rates charged by Central Maine in connection with electric space heating represented unfair competition."* *Id.,* 382 A.2d at 311. Finding the Commission's basic concern in a rate investigation to be *"the relationship of ratepayer to public utility (and ratepayer to ratepayer where discriminatory tariffs are at issue)",* *Id.* at 312, we concluded:

> We discern in the rate regulation scheme no legislative intent that the Commission take into account the interests of unregulated third parties who chance to be somewhat in competition with a regulated utility. *Id.*

We further observed that MODA made no claim that the interests of ratepayers were insufficiently represented in the proceeding, and concluded that, in reality, *"intervenor status was sought here to guarantee a right of judicial review rather than to*

*make possible the presentation of testimony."* *Id.* at 314.

MODA's participation in these proceedings before the Commission transpired under far different circumstances. No claim of unfair competition was raised; indeed, the petition[10] to intervene gives no hint of competitive motives whatsoever.[11] More importantly, the Commission itself preempted any surreptitious attempt to evade our holding in the prior *Central Maine* case by granting intervenor status with the qualification that *"the intervention must be limited to participation as ratepayers, and any attempt to introduce evidence which relates solely to the competitive position of the oil dealers will be excluded."* Finally, MODA's *bona fides* is demonstrated by its averment in its petition that no expert witness would testify as to rate structure, but that MODA wished to offer such evidence and to cross-examine witnesses on the issue. While that prediction held true only with respect to the Commission, it was reasonable for the Commission to consider it appropriate, in light of other intervenors presenting expert witnesses primarily representing the interests of other customer classes,[12] to insure a voice for the small general service customers. While a grant of intervenor status was not necessary to allow either testimony or cross-examination, it served to settle the issue early in the proceedings, and perhaps avoid later challenges to MODA's right to cross-examine.[13]

---

10. The petition was filed on behalf of both MODA, a CMP ratepayer, and on behalf of approximately 150 member ratepayers. Some 98 authorization forms from MODA members were produced in support of the petition.

11. The petition alleged in part:

> Further as evidenced in its present filing, the rate of return to CMP from the small general service class is considerably higher than that of residential class (12.93 to 8.36). Petitioner believes that the rate of return from the small general service class cannot be supported by evidence of cost of service and also that the delineation by CMP between the residential and small general service class is unjust, unreasonable and not cost related. As a result, Petitioner and its members feel that there exists unjust dis-

crimination between classes and within classes.

12. For example, both the Consumer Coalition and the Natural Resources Council represented essentially residential constituencies, while St. Regis (as well as other intervenors who have not appealed) represented the larger General Service Transmission (GST) customer class.

13. Intervenors may testify and cross-examine by right, while *"interested parties"* may be precluded from either within the Commission's discretion, under Commission Rule 16.7. Although, by the same token, both testimonial and cross-examination rights may be granted interested parties, an early determination of such rights obviates disruptive delays which may arise when these matters must be settled on an *ad hoc* basis.

While CMP contends in conclusory terms that MODA paid only lip service to its own general service rate, and focused its case upon residential rates (as to which it is competitor), our inspection of the record does not support an allegation of competitive advocacy.

Rather, MODA's concern with residential rates dove-tails precisely with its stated rationale for intervention: to demonstrate cost and return inequities between its own small general service rate and residential rates. Indeed, its interest and position is comparable to that of intervenor St. Regis Paper Company, which sought realignment of customer classes on behalf of the large general service transmission (GST) ratepayers. Like St. Regis, MODA's interest was that of one allegedly prejudiced by a discrimination in favor of residential customers which Central Maine itself recognized and challenged. Presentation of that case necessarily entailed reference to residential rates. We are not prepared to deny the Commission the opportunity to hear a legitimate representative of any customer class merely because the representative may, in some tangential way not presented during the proceeding, be in competition with the utility. *Compare, Cole v. Washington Utilities and Transportation Commission*, 79 Wash.2d 302, 485 P.2d 71, 90 P.U.R.3d 62 (1971). Our holding in the 1978 *Central Maine Power v. Public Utilities Commission* case is not inconsistent;[14] our earlier decision in *Gifford v. Central Maine Power Company*, Me., 217 A.2d 200 (1966) controls.

In *Gifford* we recognized the right of an oil dealers group to appeal from a Commission decision, where they had established their status as ratepayers, and claimed aggrievement as such.[15] To deny MODA members the right to intervene on the ground that they are competitors would be to deprive them of a right they enjoy by virtue of their status as ratepayers solely because of a secondary status they possess in an area wholly outside the concern of the Commission.

In its decisions with respect to procedural matters, the Commission assumes a status comparable to a court, bound by both its own rules promulgated pursuant to 35 M.R.S.A. § 3 and by the rules of procedure and evidence applicable to civil actions in the Superior Court, 35 M.R.S.A. § 308; *see also* 35 M.R.S.A. § 299; *Central Maine Power Co. v. Public Utilities Commission, supra*, 382 A.2d at 313. Accordingly, our review of the Commission's grant of intervention is limited to scrutinizing that action for evidence of an arbitrary or capricious exercise of discretion, the burden of proving which rests with CMP. *In Re O'Donnell's Express*, Me., 260 A.2d 539 (1970); *W. H. Glover Co. v. Smith*, 126 Me. 397, 400, 138 A. 770, 772 (1927). We are satisfied that the Commission properly allowed MODA to intervene as representative of ratepayers "*directly and substantially affected by the proceeding,*" and properly and effectively limited their participation to issues as to which they possessed a legitimate interest.

We deny Central Maine's appeal as to this issue.

### C. The Superior Court Appeal

Central Maine responded to the Commission's denial of its motion to dismiss MODA's § 291 complaint and its consolidation of that complaint with the pending rate case by taking an appeal on April 14, 1978 to the Superior Court, Kennebec County. This interlocutory appeal,[16] in the form

14. In this regard, we note that issues concerning both the *"relationship of ratepayer to public utility (and ratepayer to ratepayer [)]"* referred to in the immediately preceding *Central Maine* case were presented by MODA's petition.

15. Significantly, the oil dealers in *Gifford* complained that as *ratepayers* they were aggrieved by CMP's practice of offering certain promotional allowances designed to encourage increased electrical use. Certainly the competitive disadvantage to the dealers presented by these allowances was obvious, yet was *sub silentio* found insufficient to disqualify them from a right to which they were entitled as ratepayers.

16. All parties agree that 35 M.R.S.A. § 303 is inapplicable to this 80B appeal, concerning as it does only appeals to the Law Court from final Commission decisions.

of a Rule 80B, Maine Rules of Civil Procedure complaint, sought injunctive relief pursuant to 14 M.R.S.A. § 6051(13) and Rule 65, M.R.Civ.P., declaratory relief pursuant to 14 M.R.S.A. §§ 5951 *et seq.*, and relief in the nature of prohibition. After hearing the Superior Court dismissed the appeal *"for lack of jurisdiction,"* without further elaboration. Central Maine appeals from this dismissal, alleging that the Superior Court's equitable jurisdiction is not foreclosed by 35 M.R.S.A. §§ 303 or 305 where the claimed error is Commission action in excess of its jurisdiction.

We dismiss this appeal as moot.

As part of its consolidated § 303 appeal from the final decision of the Commission, Central Maine has placed before this Court the substantive issues (of MODA's § 291 complaint and its consolidation with the rate case) raised initially before the Superior Court. We have sustained Central Maine's appeals with respect to that complaint and consolidation, the merits of which were not reached by the Superior Court.

CMP now asks that we reverse the Superior Court's dismissal and hold that jurisdiction existed to entertain the substantive claims of its Rule 80B complaint. As we said recently in *Central Maine Power Company v. Maine Public Utilities Commission, et al.,* Me., 395 A.2d 414, 434 (1978), *"[w]e do not reach that question because our decision on the merits of the section 305 action* [here, 303 appeal] *moots all substantive issues brought before the Superior Court."* Having held the Commission's action in permitting and consolidating the § 291 complaint erroneous, any decision as to the jurisdiction of the Superior Court to entertain an interlocutory appeal from such action would now be meaningless. Neither can the Superior Court, were we to decide it has jurisdiction (a question which we explicitly do not determine), provide any effective relief at this stage of the proceedings not

already secured to Central Maine by our decision. Accordingly,

There being no issues remaining for the *Superior Court to determine on the merits, CMP's appeal from that court's dismissal of its Rule 80B complaint must be denied for mootness. Central Maine Power Company v. Maine Public Utilities Commission, et al., supra,* 395 A.2d at 434.

## DEFERRED TAX ISSUE

### I.

█ One of the principal issues raised in this appeal concerns CMP's taking of *"accelerated"* depreciation [17] over the useful life of its property. We have previously dealt with the proper treatment of accelerated depreciation for ratemaking purposes on many occasions. *See Continental Telephone Company of Maine v. Public Utilities Commission,* Me., 397 A.2d 1001 (1979); *Mars Hills & Blaine Water Company, et al. v. Public Utilities Commission,* Me., 397 A.2d 570 (1979); *Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302 (1978); *Mechanic Falls Water Company v. Public Utilities Commission,* Me., 381 A.2d 1080; *Central Maine Power Company v. Public Utilities Commission,* 153 Me. 228, 136 A.2d 726 (1957); and, most significantly for purposes of this case, *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 390 A.2d 8 (1978) (*"New England Telephone"* or *"New England"*).

Our decision in *New England Telephone* was announced shortly before conclusion of the hearings which underlie the present appeal. In the order reviewed in the *New England* case the Commission disallowed as a legitimate ratemaking expense federal income taxes deferred by New England's use of accelerated depreciation, action which increased the utility's net income and effected

---

**17.** The *"straight line"* method of depreciation allows the taxpayer to deduct from his taxable income equal annual amounts over the useful life of the asset. *"Accelerated"* methods allow

greater deductions during the earlier years and lesser ones later in the asset's useful life. *See New England Telephone, supra,* at 18, n.3.

a *"flow-through"*[18] of the *"deferred"* taxes to the ratepayer. The Court reversed the Commission on this issue, holding that such an adjustment was

> contrary to the established national economic policy established by Congress, and that the Commission's arbitrary treatment of New England's books of account in this respect and its placing of New England in jeopardy of losing its right to take such accelerated depreciation constituted an abuse of discretion.

390 A.2d at 12–13.

A brief review of the context and content of the *New England* decision is in order. As part of the ratemaking process[19] a utility presents its operating expenses incurred in the production of gross revenues. Included in such operating expenses is its tax expense. In *New England* the Company claimed $3,612,000 in *"deferred taxes"* for the test year 1976, representing taxes deferred by use of an accelerated rather than straight-line depreciation method, as provided under Internal Revenue Code § 167. New England sought to *"normalize"*[20] taxes thus deferred with respect to property acquired after 1969. The Commission, however, found that use of accelerated depreciation produced not merely a deferral of taxes, but an actual tax *savings*. The Commission thus increased the utility's net income by the amount of deferred taxes ($3,612,000) resulting in a *"flow-through"* to the ratepayers of the alleged *"savings."* 390 A.2d at 18–19.

New England argued on appeal that this action would cause it to lose its right to take accelerated depreciation under Internal Revenue Code § 167(*l*). Although we noted that in similar circumstances courts and commissions of other jurisdictions had agreed with New England's claim, we found it unnecessary to reach that substantive issue, concluding instead that the Commission's disregard of New England's books of account[21] in order to impute flow-through *"was an arbitrary exercise of the Commission's power and constituted an abuse of its discretion"* as a matter of state law. 390 A.2d at 23.

Although we stopped short of declaring that the Commission's action *would* cause New England to lose its ability to take accelerated depreciation, our finding of arbitrariness in the Commission's action was based both on its disregard of the Company's books and its *"plac*[ing of] *New England in jeopardy of losing its ability to take accelerated depreciation."* 390 A.2d at 24 (emphasis added). In dicta we noted *"considerable support,"* *"[s]trong argument,"* and *"a reasonable likelihood"* *"strongly suggest*[ed]*"* by *"all indications"* that the utility's right would be forfeited if imputation of flow-through was upheld. *Id.*

Prior to announcement of the *New England* decision on June 28, 1978, the Commission staff had advocated a similar flow-through of deferred taxes with respect to Central Maine Power, whose rate case was then being heard before the Commission.

---

18. Under the *"flow-through"* method of ratemaking, utilities using accelerated depreciation for tax purposes must use the same method for calculating cost of service, and thus pass on any tax savings to their customers. *See New England Telephone, supra,* at 19, n.6.

19. *See New England Telephone, supra,* at 18.

20. Normalization is the process by which a utility uses accelerated depreciation for income tax purposes as if it had taken straight-line depreciation. Thus, initially at least, the utility is able to collect, as a component of its cost of service, a greater sum for tax expense than it actually pays. This excess amount is credited to a *"deferred tax reserve"*, a bookkeeping device providing both expansion capital and a

source of funds with which to pay later taxes which, at least in theory, will exceed revenues collected for taxes when a crossover point in the asset's life is reached. *See New England Telephone, supra,* at 18–19, n.4.

21. The Commission ordered New England to continue to normalize its books of account, though it would impute flow-through of the tax deferrals, thereby disregarding the utility's book cost of service. We held it an abuse of discretion and an arbitrary exercise of power for the Commission to order New England to keep its books by one method while setting rates by another. *Id.,* at 22–23.

On July 10, 1978, the first day of hearings following *New England Telephone*, Commission counsel presented this reaction.

> *Now in light of the Supreme Court ruling in the Telephone Company case with reference to deferred federal income taxes and flowing through the benefits of the same, we may very well take the position that deferred federal income taxes are customer contributed capital and, therefore, recommend disallowing depreciation expense thereon. And moreover, in connection with the same issue, I would also give notice that the staff can be . . . expected to take the position that the benefits of accelerated depreciation on post 1969 replacement property should be flowed through to the ratepayer.*[22]

To effect its determination not to allow Central Maine Power to take, for ratemaking purposes, depreciation on *"plant financed by deferred taxes"* the Commission applied Central Maine Power's composite depreciation rate (3.32%) to its deferred tax reserve of $19,504,000, reducing depreciation expense by the resultant $648,000.[23]

The Commission adjustment entails computation of the Company's income *tax* expense using the full range and amount of depreciable property, but exclusion of *"property financed by deferred taxes"* in calculation of book *depreciation* expense.

The Commission's adjustment is premised on its contention that plant financed by the deferred tax reserve constitutes *"contributed property,"* as to which we have previously affirmed the propriety of disallowing depreciation expense. *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977).

The amount represented by the deferred tax reserve (averaging $19,504,000 during the 1977 test year) is indisputably non-investor supplied capital[24] upon which Central Maine Power is not entitled to a return, and which was, accordingly, deducted in calculation of the rate base. The Commission, however, explains that it *"reasoned that ratepayers, as the suppliers of the non-investor supplied capital, are also entitled to a return of their capital."* The Commission's disallowance in ratemaking of the depreciation of plant financed by this reserve was designed to secure for the ratepayers this *"return"* of capital, which would otherwise inure to the benefit of the Company.

In *Mechanics Falls, supra*, we defined *"contributed property"* as *"property a utility validly acquired by way of a voluntary donation."* 381 A.2d at 1104, n.43. This definition has focused debate upon whether the tax reserve in fact is a *"voluntary donation"*, and if so, from whom it is received.

Central Maine contends that deferred taxes are not voluntary donations, but are simply a component of the revenue requirement collected through rates. No investment *"capital"* is supplied by ratepayers, but simply the cost of service, including a return for investors. Further, the Company argues, any *"capital contribution"* made is made not by the ratepayers but by the federal government, when it foregoes immediate collection of tax dollars to which it is entitled.

The Commission dismisses these arguments as mere semantics. The function of depreciation, it points out, is to recover the investment in property over the life of that property. Depreciation on contributed property is therefore disallowed not to credit the donees, but to insure that investors who did not supply capital for the contrib-

---

22. Only that portion of the Commission's Decree regarding depreciation on post-1969 *expansion* property is at issue in this appeal. *See* n.29, *infra; Mars Hill & Blaine Water Co. v. Public Utilities Commission*, Me., 397 A.2d 570, 580 (1979).

23. The *"Maine jurisdictional"* portion of this sum is $641,500.

24. Although there is some dispute as to who *does* supply this capital, *see infra*, there is no question but that Central Maine Power's investors do not, and should not therefore earn a return on it. The accepted practice of excluding it from the rate base is not, therefore, challenged here. The Commission's further action in seeking to provide a return on that capital for the ratepayers, however, is the basis of the appeal on this issue.

uted property do not recover on an *"invest-ment"* they did not make. Therefore, whether the capital represented by the tax reserve is contributed by ratepayers or by the United States government, it assuredly is *not* supplied by the Company's investors, and should not therefore redound to their benefit.

By its own analysis, a further condition to the validity of the Commission's adjustment is that the capital contribution be a permanent one, which, in this context, means that the deferred taxes *"held"* in the reserve for future payment must in fact be *permanent tax savings.*

The Commission has taken the position that *"deferred"* taxes are actually permanent tax savings on several occasions prior to this case.

Here, a Commission staff witness testified at length on the subject, explaining that, in his view,

> The only requirements for deferred taxes not to be paid is that depreciable plant does not decrease while the company has taxable income. In fact as long as the plant continues to grow, the taxes actually paid will always be less than those included as operating expense under the normalization method.

> . . . . .

> when looked at from the perspective of a single piece of plant liberalized depreciation simply provides for an accelerated of the depreciation deductions. However, when looked at from the perspective of reality, i. e., an entire utility plant, the total depreciation expense for tax purposes will always be greater than the straight line depreciation expense.

In sum, he concluded:

> where depreciable plant continues to grow the tax depreciation deductions under liberalized depreciation provisions will always be greater than book depreciation using straight line . . . [U]nder such conditions the utility will continue indefinitely to realize tax savings and not just a tax deferral.

Courts and scholars, the Commission continues, have confirmed the truth of this analysis. This Court, it therefore urges, should defer to the discretion of the Commission in the realm of such economic fact-finding.

The Company, for its part, assails the Commission's presentation as a *"re-hash"* of its losing arguments before this Court in *New England Telephone.* In substance, we must agree.

It is true, as the Commission points out, that in 1957 we affirmed a Commission order that the benefits of the deferred tax reserve be flowed through to current rate-payers. *Central Maine Power Co. v. P. U. C.*, 153 Me. 228, 136 A.2d 726, 737–739 (1957). As we observed in *New England Telephone*, however,

> The 1957 Central Maine Power Co. case was decided in the context of federal tax law existing before the Tax Reform Act of 1969, which substantially affected the availability of accelerated depreciation to public utilities.

*New England Tel. & Tel. Co. v. P. U. C.*, supra, 390 A.2d at 16.

Thus we concluded, in the *New England* case,

> . . . it is clear from reading the hearings, that the Congress recognized that when accelerated depreciation was used, no tax "savings" were thereby affected, rather payment of the tax was "deferred" in part. The intended effect of this deferral was to create a deferred tax reserve which provided interest-free capital to the utility hopefully to be used for plant expansion.

*Id.* at 18.

It was the enactment of § 167(*l*) and the Congressional intent it evidences, which so clearly makes our 1957 *Central Maine* decision distinguishable. The crux of our decision there was that after a study of § 167 as then extant, we were

> unable to find an intent on the part of Congress that the ratepayers of a regulated utility should provide an interest free loan to the Company through present payment of a deferred tax.

153 Me. at 248, 136 A.2d at 738. We quoted this passage in *New England,* 390 A.2d at 20, and while we sustained the appeal without further analysis of the Congressional intent underlying § 167*(l)*, we implicitly concluded that our statement in the 1957 *Central Maine* case was no longer accurate.

Our extensive review of the Legislative history of § 167*(l)*, in *New England Telephone* need not be reiterated here, except to note again our conclusion that Congress intended *"to create a deferred tax reserve which* [would provide] *interest-free capital to the utility . . . for plant expansion."* 390 A.2d at 18.

If the action here taken by the Commission constitutes a flow-through of deferred taxes, it would, of course, deplete the source of interest-free capital Congress sought to insure by enacting § 167*(l)*, and would thus be inconsistent with national economic policy. Simultaneously, it would [25] place Central Maine Power in jeopardy of losing its right to take accelerated depreciation for federal tax purposes, and therefore constitute *"an arbitrary exercise of the Commission's power and . . . an abuse of its discretion"* prohibited by state law. *New England Telephone, supra,* at 23.

The Tax Reform Act of 1969 [26] added subsection *(l)* to § 167 of the Internal Revenue Code. As we noted in *New England Telephone,* 390 A.2d at 17, the amendment was a reflection of Congressional concern over the double loss of tax revenues resulting from the combination of accelerated depreciation for computing federal taxes (leading to higher deductions) and flow-through for fixing rates (leading to lower rates and thus lower gross revenues). The addition of § 167*(l)* was intended *"in general to 'freeze' the current situation regarding methods of depreciation"* in public utilities. H.R. Report No. 91–413, 91st Cong. 1st Sess. (1969), *reprinted in* [1969] *U.S.Code Cong. & Admin.News,* pp. 1645, 1783, quoted in *New England Telephone Co. v. Public Utilities Commission, supra,* at 17.

As ultimately enacted, § 167*(l)* distinguishes between two types of public utility property: *"pre-1970 property,"* [27] (acquired before January 1, 1970) and all other property, designated *"post-1969 property".* [28] Post-1969 property is further divided between expansion [29] and replacement property. With respect to pre-1970 property a utility may use

1. Straight-line depreciation;

2. The method used prior to August 1969 if it also normalizes; or

3. Accelerated depreciation with flow-through, but only if that method was used prior to August 1969. [167*(l)* (1)].

With respect to post-1969 property, a utility may use:

1. Straight-line depreciation;

2. Accelerated depreciation with normalization; or

3. Accelerated depreciation with flow-through if the utility used flow-through prior to August 1969 [167*(l)* (1).]

3a. With respect to expansion property, utility could elect to abandon accelerated depreciation with flow-through in favor of normalization. [167*(l)* (4)(A)].

In *Mars Hill & Blaine Water Co. v. P. U. C.,* Me., 397 A.2d 570, 578–581 (1979), we

---

**25.** Assuming, also, that contrary to the Commission's argument here, and in *New England Telephone,* 390 A.2d at 22, n.9, action by a regulatory commission which violates § 167*(l)*, will result in loss of the right to take accelerated depreciation on the part of the affected utility. *See* discussion of this issue, *infra.*

**26.** *Pub.L.* 91–172, § 441(a) (1969).

**27.** I.R.C. § 167*(l)* (1); *see Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080, 1101 (1977).

**28.** I.R.C. § 167*(l)* (2); *see Mars Hill & Blaine Water Co. v. Public Utilities Commission,* Me., 397 A.2d 570, 580–581 (1979).

**29.** *"Expansion"* property is that *"which increases the productive or operational capacity of the taxpayer with respect to the goods or services described in paragraph (3)(A)* [e. g., utility services] *and does not represent the replacement of existing capacity."* I.R.C. & 167*(l)* (4)(A).

summarized our case law concerning Commission efforts to require flow-through and the effect of I.R.C. § 167(*l*) on a utility's ability to continue taking accelerated depreciation on its property:

> *Where we have found no conflict between the Commission's actions and section 167(l)*, we have continued to leave the treatment of accelerated depreciation to the Commission's discretion and expertise. <u>Central Maine Power Co. v. Public Utilities Commission, supra</u> (1978); <u>Mechanic Falls Water Co. v. Public Utilities Commission, supra</u> (1977). On the other hand, where we have found that the Commission's actions arbitrarily "jeopardized" *a utility's ability to take accelerated depreciation under section 167(l)*, we have held the Commission's actions to be an unreasonable exercise of power and abuse of discretion. <u>New England Telephone & Telephone Co. v. Public Utilities Commission, supra</u> (1978).

We went on to hold that, for federal tax purposes with respect to post-1979 property, flow-through is permissible, "*If the conditions provided by subparagraph (c)* [of § 167 *(l)(2)*] *are met.*" Those conditions are that the taxpayer-utility (a) have used a flow-through accounting method for its July 1969 period, and (b) not have made an election under paragraph (4)(A) of § 167(*l*) which would entitle it to *"avoid the effect of paragraph (2)(C)."* 397 A.2d at 580. We found the water companies involved in *Mars Hill* to be subject to the operation of paragraph (2)(C) of & 167(*l*), having (a) presumably [30] used accelerated depreciation with flow-through during July 1969, and (b) having failed to produce evidence of an election under paragraph (4)(A) such as would exempt them from the effect of paragraph (2)(C). 397 A.2d at 580. Accordingly, we distinguished *New England Telephone* (which had not used flow-through for its July 1969 accounting period) and held that the Commission might properly *"in its discretion, require* [the water companies] *to*

use accelerated depreciation with flow-through for post-1969 property for rate-making purposes without jeopardizing [their] *right to take accelerated depreciation." Id.*

In dicta we observed that

> *If the Water Companies had made a valid election under this subparagraph [(4)(A)] the available depreciation methods would be limited to those provided in § 167(l)2(A) and (B), namely, straight-line depreciation or accelerated depreciation with normalization.* Treas.Reg. § 1.167(*l*)–2(a)(1) (1978). See <u>Federal Power Commission v. Memphis Light, Gas & Water Division,</u> 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973).

*Id.* at 580.

To paraphrase our conclusion in *Mars Hill,* the present case differs from *Mars Hill* in a crucial respect: Unlike the Water Companies, Central Maine Power was *not* subject to the operation of paragraph (2)(C) of I.R.C. § 167(*l*). Although, like the Water Companies (and unlike New England Telephone), Central Maine used accelerated depreciation with flow-through for its July 1969 accounting, it, unlike the Water Companies, exercised its option to avoid the effect of paragraph (2)(C) by making a valid election under paragraph (4)(A) of § 167(*l*). Having done so, its *"available depreciation methods* [are] *limited to those provided in § 167(l)(2)(A) and (B), namely, straight-line depreciation or accelerated depreciation with normalization."* Id. at 580.

The issue is thus squarely presented: does the Commission adjustment place Central Maine in jeopardy of losing its right to take accelerated depreciation by departing from the requirements of normalization?

Section 167(*l*)(3)(G) of the Internal Revenue Code provides:

> *Normalization Method of Accounting.—* In order to use a normalization method of accounting with respect to any public utility property—

**30.** The Water Companies produced no evidence as to the accounting method used during the July 1969 accounting period. Accordingly, the Commission treated them as if they had used flow-through during that period, in light of the Commission's traditional policy of requiring such treatment. We affirmed. 397 A.2d at 570–80, n.11.

(i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and

(ii) if, to compute its allowance for depreciation under this section, it uses a method of depreciation other than the method it used for the purposes described in clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation.

Central Maine contends that the Commission's disallowance of depreciation on plant financed by deferred taxes violates the normalization requirement of § 167(l) by calculating depreciation expense for ratemaking purposes differently from income tax for ratemaking purposes. That is, while the Commission calculates CMP's tax expense using the full amount of allowable depreciation, it calculates CMP's depreciation expense *excluding "depreciation on property financed by deferred taxes."*

Though the Commission *"purports"* to require the Company to depreciate *all* its property on its books, CMP argues, its refusal to allow *all* such depreciation for ratemaking purposes means that CMP will *not* be normalizing within the meaning of § 167 *(l)*, and will lose its right to use accelerated depreciation.

The Commission, however, contends that its judgment poses no possibility of adverse tax consequences because, first, § 167(l) regulates only the *taxpayer's* method of accounting on its regulated books of account, not a regulatory commission's ratemaking methodology, and, secondly, in any event it constitutes not a different method of depreciation, but merely a change in the *basis* of CMP's depreciable assets.

As to its first point, the Commission notes the absence of statutory language applicable to regulatory methodology, and expressions of Congressional intent that normalization not interfere with the prerogatives of state regulatory commissions. While differing interpretations of § 167(l) abound in the legislative history, the Commission continues, the principal author of the scheme [31] viewed it as applicable only to the utility's accounting methodology, and not to state regulatory policies. *Hearings on H.R. 6659, House Comm. on Ways and Means,* 91st Cong., 1st Sess. at 3850–54 (1969). Accordingly, it is argued, a rate-making adjustment could not and has not placed CMP in jeopardy of losing its right to take accelerated depreciation.

As to the second point, the Commission found, and now contends, that its adjustment is—if in fact it must be—entirely consistent with a normalization method of accounting, entailing only an adjustment in the depreciable *basis* of CMP's assets. It must be noted, the Commission argues, that no adjustment to CMP's *tax* expense was made; [32] the reduction in *book* depreciation expense was made solely to account for the portion of CMP's depreciable property financed not by investor supplied capital, but by contributed capital. Finding it impossible to trace the capital source of any given asset, the Commission used the Company's composite depreciation rate in its calculations, assuming that an equal portion of each depreciable asset had been financed by contributed capital. In effect, then, the Commission contends, it merely adjusted the depreciable *basis* of every depreciable asset of CMP to account for that portion financed by customer-contributed capital.

---

**31.** Dr. Homer A. Black, Chairman of Accounting, Florida State University. Without directly contesting this point, CMP cites Doctor Black's testimony during the same hearings in support of its arguments against the Commission's contributed capital/permanent tax savings theory.

**32.** CMP's test year taxes were computed as if the Company were using straight-line depreciation, when in fact accelerated depreciation was used. The Commission acknowledges that it flowed through the benefits of accelerated depreciation for the purposes of *state* income tax and federal income tax on *replacement* property. The present appeal does not challenge these adjustments. *Central Maine Power v. Public Utilities Commission, supra* (1978); I.R.C. § 167(1)(2)(C).

While the result as to each asset is a slightly different depreciable basis for tax purposes than for book depreciation purposes, such a difference in basis does not constitute a different *method* of depreciation under § 167(*l*)(3)(G). In fact, the Commission argues, the depreciable basis of an asset for tax purposes often varies from its depreciable basis for book purposes, due to Commission policies on construction work in progress (CWIP) and the allowance for funds used during construction (AFUDC). Different *amounts* of depreciation are thus often used in computing tax expense and in computing depreciation expense for establishing cost of service and for reflecting operating results on its books of account. This use of differing amounts of depreciation resulting from different depreciation bases does not constitute use of different methods of depreciation, and does not violate normalization methods. *S.Rep.No.91–552*, 91st Cong., 1st Sess., *U.S.Code Cong. & Admin.News*, pp. 2027, 2207 (1969); *Treas. Reg.* § 1.167(*l*)–1(a)(2).

In sum, the Commission argues, its adjustment of CMP's book depreciation expense left the Company's tax expense undisturbed, and therefore did *not* flow-through the benefits of accelerated depreciation. The adjustment, rather than flowing through such benefits, merely reflected the economic reality that investors have not supplied all the capital used to finance CMP's depreciable assets.

We find the Commission's first point to be untenable. Again, without reiterating our review of the Legislative history of § 167(*l*) presented in *New England Telephone, see* 390 A.2d at 22, n.9, we think it clearly implied there that regulatory commission imposed accounting methods which violate the Internal Revenue Code will penalize the subject utility, irrespective of its reluctance to adopt such methods. A contrary conclusion would ask us to believe that Congress intended the structures of § 167(*l*) to be merely advisory; that if state regulatory agencies wished to defy national economic policy they were free to do so. Moreover, even a cursory reading of the I.R.S. Regulations and Private Letter Rulings [33] cited to us makes clear that, even if imposed by a regulatory body, accounting methods which violate § 167(*l*) will produce adverse tax consequences for the affected utility.

We also reject the Commission's argument that its adjustment constitutes a mere change in basis. While it is true that the Commission did not *directly* adjust Central Maine Power's tax expense, we do not find that determinative of the issue.

We have said before that a regulatory agency may not do by indirection what is forbidden it to do directly. *Peggy S. M. v. State*, Me., 397 A.2d 980, 983 (1979). If it is forbidden to directly flow through the benefits of accelerated depreciation, it is forbidden to impose an adjustment having the same effect, i. e., one inconsistent with full normalization.

Full normalization requires that the *entire* deferral of taxes resulting from the difference between (a) the depreciation method used in the regulated books of account (namely, straight-line), and (b) the accelerated depreciation method used on the income tax return, be normalized. The methodology employed by the Commission results, instead, in a partial flow-through of those deferred taxes. That this end is accomplished not directly but by excluding from book depreciation a portion of the value of depreciable assets allowed for tax purposes under the rubric of a *"basis"* change is irrelevant. In either case normalization (and Congressional intent) is frustrated. In either case the amount of deferred taxes properly includable in the cost of service is reduced, to the benefit of the ratepayers and to the detriment of the utility and national economic policy. Without ordering a change in Central Maine Power's accounting methods, the Commission adjusted its book depreciation expense to account for what it considers non-investor supplied capital. That adjustment was made by applying Central Maine Power's

---

**33.** See discussion of this authority, *post.* at pp. 172–174.

composite depreciation rate to its total deferred tax reserve. That deferred tax reserve was computed on the basis of accelerated depreciation. Staff witness Louiselle confirmed the intent and result of this process:

> Q. Under the method that you're proposing here, you're asking that this Commission _for ratemaking purposes disallow_ depreciation expense on that part of utility property financed by deferred taxes even though CMP is _permitted_ to take depreciation expense thereon _for tax purposes_, are you not?
>
> A. _Yes, sir._ (emphasis added).

The I.R.S. has ruled, however, in each of the private rulings referred to above,

> that to use a normalization method of accounting . . . the taxpayer must use the same method of depreciation to compute _both its tax expense and depreciation expense_ for establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account. (emphasis added).

The Commission's adjustment departs from the definition of normalization by requiring calculation of depreciation expense for ratemaking purposes differently than for tax purposes. That is, CMP's tax expense is computed as if it were taking straight-line depreciation; since in fact it is taking accelerated depreciation the difference between taxes actually paid and those due under a straight-line method must be credited to a deferred tax account. By using CMP's composite depreciation rate times its deferred tax reserve to equal book depreciation expense, the Commission was effectively using accelerated depreciation to compute depreciation for ratemaking purposes and straight-line depreciation to compute depreciation for tax purposes.

Congress forbade different methods of depreciation for tax and ratemaking purposes in order to provide interest-free investment capital for utility expansion. Regulation which results in the _"loan"_ being extended (by virtue of accelerated depreciation) but also in the utility being forced to divert a portion of it to other uses as income (by virtue of it being denied as an expense) does not comport with Congressional intent. The result must surely be denial of the _"loan,"_ i. e., the loss of the right to accelerated depreciation.

As we observed in _New England Telephone_, normalization of a utility's regulated books of account does not meet the § 167(_l_) requirement of normalization if these books may be disregarded by the Commission in setting rates. Where the Commission sets rates reflecting a lower depreciation expense than it permits to be taken for tax purposes, a partial flow-through _results_ (whether the Commission wishes to thus characterize it or not) in the form of lower rates. The utility thus loses, as a direct consequence, the full benefit of the deferred taxes it is allowed, and is further placed in jeopardy of losing entirely its right to take accelerated depreciation.

Both Internal Revenue Service Regulations and two Private Letter Rulings stemming from California Public Utilities Commission action graphically illustrate that it is the _effect_, rather than the _form_, which must be considered in determining the risk to a utility of losing its right to accelerated depreciation. _"Examples 4 and 5"_ accompanying I.R.S. Regs. § 1.167(_l_)–(h)(2)(ii) demonstrate the significance of the effects present here:

> _Example (4). Corporation Z, exclusively engaged in a public utility activity did not use a flow-through method of regulated accounting for its July 1969 regulated accounting period. In 1971, a regulatory body having jurisdiction over all of Z's property issued an order applicable to all years beginning with 1968 which provided, in effect, that Z use an accelerated method of depreciation for purposes of section 167 and for determining its tax expenses for purposes of reflecting operating results in its regulated books of account. The order further provided that Z normalize 50 percent of the tax deferral resulting therefrom. Under section 167(l), the method of accounting provided in the order would not be a normalization_

*method* of regulated accounting *because Z would not be permitted to normalize 100 percent of the tax deferral* resulting from the use of an accelerated method of depreciation. Thus, with respect to its public utility property for purposes of section 167, Z may only use a subsection *(1)* [i. e., straight-line] method of depreciation.

Example (5). Assume the same facts as in example (4) except that the order of the regulatory body provided, *in effect*, that Z normalize 100 percent of the tax deferral with respect to 50 percent of its public utility property and flow-through the tax savings with respect to the other 50 percent of its property. Because *the effect* of such an order *would allow Z to flow-through a portion of the tax savings* resulting from the use of an accelerated method of depreciation, Z would not be using a normalization method of regulated accounting with respect to *any* of its properties. Thus, with respect to its public utility property for purposes of section 167, Z may only use a subsection *(1)* method of depreciation.

I.R.S. Reg. § 1.167(*1*)—(h)(2)(ii), Examples 4 and 5 (Emp. added).

The Commission's treatment of CMP's depreciable property may be profitably analogized to that involved in Example (5). In each case the Company's property was divided; in CMP's case, into *"plant financed by deferred taxes"* and remaining plant. Normalization was employed as to the latter portion, while (proportionate) tax savings attributable to the former were passed on to ratepayers by virtue of the concommitant reduction in CMP's cost of service. Because the *effect* of the Commission's order is *"to flow-through a portion of the tax savings resulting from the use of an accelerated method of depreciation,* [CMP] *would not be using a normalization method*

. . . *with respect to any of its properties."* (Example (5), *supra*.

The Commission's brief itself proclaims that *"[t]he most significant events outside the State of Maine since the 1978 New England* case relate to the California Public Utilities Commission's treatment of deferred taxes,"* citing *Pacific Telephone & Telegraph Company, et al.,* —— P.U.R.4th —— (Cal. P.U.C. 1977).[34] More significant, however, is the initial I.R.S. reaction to that decision.

The California commission, in a case comparable to the present one, devised *"a method to flow-through to the consumer in the form of lower rates a part of the reserve for deferred taxes."* To do so it calculated an *"average deferred tax reserve"* based on a three-year forward projection, and deducted it from the test year rate base to determine revenue requirements. As a result, both rate base and revenue requirements were lower than they would have been had only the test year reserve been deducted. In private revenue rulings, the I.R.S. has advised the affected companies that—if and when the decision becomes final—they will lose their right to accelerated depreciation for federal income tax purposes, since the Commission action violates normalization principles. *I.R.S. Private Letter Ruling* 7836038 (June 8, 1978); *I.R.S. Private Letter Ruling* 7836048 (June 9, 1978).

The latter ruling, pertaining to an *"average annual adjustment method"* of determining deferred taxes to be allowed in setting rates, concluded that

*[w]e believe the Commission's average annual adjustment method is a method to flow-through to the consumer in the form of lower rates a part of the reserve for deferred taxes. This does not appear to be what Congress intended by its enactment of section 167(1) of the Code.*

Pacific Tel. & Tel. v. Public Utilities Commission of California, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713 (1978); General Tel. Co. of California v. Public Utilities Commission of California, 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978).

---

34. The Commission cites this consolidated case in support of its contention that ratemaking adjustments by a regulator cannot violate the normalization requirement to the detriment of the utility. That both the California and United States Supreme Courts have denied *certiorari*, it argues, supports this reading of § 167(*1*).

Suggesting that, in order to avoid causing the utility the loss of accelerated depreciation, the Commission might wish to amend its decision to eliminate its averaging calculations, the Ruling advised that

> it would then have to use either the _estimated reserve_ for deferred taxes in conjunction with the _estimated tax expense_ used for the purpose of establishing cost of service for ratemaking purposes, _or_ it would have to use the _actual_ reserve for deferred taxes in conjunction with the _actual tax expense_ used for the purpose of establishing cost of service for ratemaking purposes. A larger reserve deducted from the rate base without _consistency_ in computing tax expense would not be considered to be a proper normalization method of accounting and . . the taxpayer would no longer be eligible to use an accelerated method of depreciation.

_Ruling_ 7836048, _supra._ (emphasis added).

Although the method employed here _directly_ reduced tax expense for ratemaking purposes beyond what was the actual test year tax expense, the _result_ was precisely that aimed for by the Commission in the instant case: a lower overall cost of service, resulting in lower rates. The emphasis in the quoted portion of the Ruling on consistency between tax expense and the tax reserve is the crux of the issue. Where X amount has been _"loaned"_ to be placed in the reserve, equivalent tax expense must be allowed in ratemaking. Where, as here, the amounts of depreciation used for tax and ratemaking purposes differ, a portion of the _"loan"_ cannot be used as intended, but must be employed to compensate for the reduction made in cost of service and book depreciation expense.

I.R.S. Regulation § 1.167(_l_)–(h)(2)(i) states that when a taxpayer uses a normalization method of accounting it _must_ credit the amount of deferred taxes. Here, the full amount of deferred Federal income tax produced by accelerated depreciation cannot be credited to the reserve: accordingly, normalization is precluded.

In _New England Telephone, supra,_ at 20–21, we noted that the legislation (H.R. 6659) which culminated in § 167(_l_) was originally directed explicitly at the practices of regulatory agencies, rather than regulated taxpayers. As finally enacted, however, it was facially limited to prescribing the methods of depreciation available to the utilities themselves, meaning that _"[a]ny effect upon regulatory agency policies was to be as an indirect result of the statute's provisions"_ governing utilities. _Id._ at 21.

As originally directed at regulators, the amendment specifically forbade two methods of flow-through, and concluded, _"(c)_ [or] accomplish a _result similar_ to those proscribed by paragraph (a) or (b) _by any other treatment, device, or procedure."_ _Id._ (Emphasis added).

Section 167(_l_) as finally enacted omits such a catch-all provision, since it is directed at the utilities themselves, for whom it is unnecessary. As we have found, however, regulation which violates normalization will penalize the subject utility. We conclude that Congress—as indicated by this seminal expression of intent, and by subsequent I.R.S. pronouncements enforcing it—wished to insure that the _full_ benefit of deferred taxes remain within the corporation, and sought accordingly to prohibit flow-through or "any other treatment, device, or procedure" having the same effect.

We therefore conclude that the Commission action with respect to this issue is erroneous insofar as it seeks to disallow depreciation expense on _"plant financed by deferred taxes"_ by a reduction in book depreciation expense. Accordingly, on remand, Central Maine Power is to be allowed to file rates designed to produce additional revenues of $641,500, representing the erroneous reduction in revenue requirements attributable to this error.

### EMPLOYEE DISCOUNT ISSUE

Full time and retired Central Maine Power employees receive, and have received for many years, a one-third discount on their residential electric bills, excluding fuel charges. This employee dis-

count was held by the Commission to be *"not a reasonable form of employee compensation"* in these circumstances,[35] and its cost disallowed as an expense for ratemaking purposes. The disallowance increased Central Maine Power's net operating income by $121,000.

The Commission's rationale was:

. . . *Central Maine's discount is not a reasonable form of employee compensation. The level of benefits received by any given employee depends solely upon his or her level of electricity use, not upon his or her position with the Company, similarly, salary, or any other objective standard for employee compensation. The same is true for the discount as applied to retired employees.*

*In this era of energy shortages and rising marginal costs of producing electricity, we find it unreasonable for the Company to provide a discount in order to promote electricity use.*

We sustain Central Maine Power's appeal on this issue.

We begin by noting that 35 M.R.S.A. § 103 provides in relevant part, *"nor shall it be unlawful for any public utility to make special rates to its employees . . ."* The Commission, however, contends that notwithstanding the legality of such discount, its promotional effect makes it unreasonable in the present period of energy shortages and rising marginal costs of producing electricity. The Commission reasons, its mandate under 35 M.R.S.A. § 51 to insure *"just and reasonable"* rates justified its disallowance.

In *New England Tel. & Tel. Co. v. Public Utilities,* 390 A.2d 8 (1978), we held that the Commission properly deducted $16,000 of charitable contributions and $1,000 in lobbying expenses from New England's operating expenses for ratemaking purposes. 390 A.2d at 55–57. We there agreed with the

Commission that whether to allow such costs to be deducted as ratemaking expenses is *"inherently a policy decision."* 390 A.2d at 55. The Commission now urges that we declare the matter of employee discounts to likewise be a policy matter primarily entrusted to the Commission's discretion.

This we decline to do.

The Commission cites *Re Chesapeake and Potomac Telephone Co.,* 16 P.U.R.4th 314, 316 (D.C.P.S.C.1976) as at least one commission which has *"expressly recognized"* that the regulatory treatment of discounts is a matter of policy within Commission's discretion. Although we are not wholly convinced that the citation provided necessarily stands for that proposition,[36] we do not in any event find it determinative.

The Commission's first objection to the discount is that it is provided to all qualified employees without regard to position, seniority, or other differentiating factors.

The Commission has routinely recognized the propriety, in past rate cases, of undifferentiated employee benefits such as insurance and hospitalization costs. We note, also, that discounts which differentiate by seniority, salary, or status have been treated critically by commissions in other jurisdictions. *See, e. g., Re: Chesapeake & Potomac Telephone Co. of Maryland,* 13 P.U. R.4th 293, 303 (Md.P.S.C.1976); *Re: Michigan Bell Tel. Co.,* 15 P.U.R.4th 209, 219–20 (Mich.P.S.C.1976); *Re New England Tel. & Tel. Co.,* 11 P.U.R.4th 297, 303 (Mass.D.P.U. 1975). Without deciding whether discounts, if offered, *must be* undifferentiated, or that, as the Michigan P.S.C. concluded *"[n] o rational explanation . . . justifies additional benefits to certain employees to the exclusion of others,"* 15 P.U.R.4th at 220, we can discern no legitimate objection to a lack of differentiation.

*The Commission has decided that continuation of the employee discounts offered to the company employees is justified as a matter of regulatory policy.* 16 P.U.R.4th at 316.

---

**35.** The Commission did recognize that the cost of discounts *"in some instances may be chargeable to ratepayers as a reasonable form of employee compensation."*

**36.** The citation provided reads, in relevant part:

The Commission's second ground for objection is that the discount is promotional of electrical use and thus unreasonable in an era of energy shortages. Central Maine Power argues that no evidence or argument was presented to show that employees' electrical consumption is greater than non-employees' because of the discount, and that *"a finding of unreasonableness [of the discount] cannot be made on the basis of such a bare record as was made here."* Berry v. Maine Public Utilities Commission, Me., 394 A.2d 790, 794 n.13 (1978). The Commission, however, assembles in its brief portions of testimony which, when combined and analyzed, allegedly demonstrate such excessive consumption.[37] Both Central Maine Power and the Commission agree that the discount was originally offered for promotional purposes in earlier years of energy surpluses; both parties now agree that promotion of electrical consumption is to be avoided.

Similar discount issues have arisen most frequently in instances of telephone service. The early cases approved such discounts on grounds of efficiency and promotion. These justifications, however, have recently come under increasingly frequent attack. *See, e. g., Re Chesapeake & Potomac Tel. Co.,* 16 P.U.R.4th at 315 (D.C.P.S.C.1976); *Re Michigan Bell Telephone Co.,* 15 P.U.R.4th 209, 220 (Mich.P.S.C.1976); *Re Mountain States Tel. & Tel. Co.,* 95 P.U.R.3d 130, 133 (Colo.P.U.C.1972). Significantly, however, in each of these instances the commissions ultimately allowed the discounts, except to the extent that they exceeded an approved tariff or differentiated among employees (*e. g., Re Michigan Bell, supra*) or applied during system peaks (*Re Mountain States Tel. & Tel. (Colo.), supra*).

The regulatory commissions approving such discounts have cited several factors which we find relevant here. First, several commissions have given weight to the reliance on past practice by recipients of the discount. Accordingly, they have either wholly upheld the practice, *Re Chesapeake & Potomac Tel. Co.,* 16 P.U.R.4th 314, 315 (D.C.P.S.C.1976) or continued it as to retirees while gradually phasing it out as to those found ineligible, *Re Chesapeake & Potomac Tel. Co. of Maryland, supra* at

---

**37.** Testimony established that in 1977 some 2,000 employees used approximately 28.8 million kilowatt hours (KWH); that average annual use by residential space heating customers is approximately 15,000 KWH; and that average annual residential use is approximately one-third that amount. Thus, the Commission contends, record evidence demonstrates that average employee use of approximately 14,400 KWH annually (28.8 million divided by 2,000) far exceeds average non-employee consumption.

We do not consider this *"substantial evidence"* in support of the Commission. Our inspection of the record discloses no testimony directly aimed at establishing this promotional phenomenon, and, more importantly, no suggestion that the issue was ever fully and appropriately contested before the Commission.

The issue was casually injected into the proceedings by the Chairman's question to Central Maine Power's President:

Q. . . . *There are a couple of areas that I find as Chairman that I frequently get in the form of letters, et cetera, and it's not really, you know, something that you talk about in a rate case, but I'm just going to mention at least one of them at this time, and that involves really the area of employee discounts, because I don't know who else to ask this, and I've* never had an opportunity, and there's hardly a month goes by that I don't get a phone call or a letter about employee discounts. What's your policy on employee discounts?

There followed a brief quizzing on the mechanics of the policy, its rationale, and 35 M.R.S.A. § 103, of which at least two commissioners were then unaware. Immediately following this questioning Commission staff was offered an opportunity to question the witness. Despite the immediately preceding revelations, the staff declined to pursue the issue.

The difficulties engendered by a failure to fully develop the issue below are illustrated by the Commission's argument. Shortly after Central Maine Power's President cited the 15,000 KWH figure for space heating customers he stated, in response to the same question from another questioner, that the figure was *"probably 15 or 20,000"* KWH annually. Obviously, a recomputation using the higher figure yields far different results. If the Commission wished to base its decision on this computation it should have provided the utility an opportunity to contest its probity. Without information, for example, as to the number of employees who are space heating customers, the figures are of little value, and may be enormously misleading.

301–303; *Re Mountain States Tel. & Tel. Co.*, 95 P.U.R.3d 130, 133–134 (Colo.P.U.C. 1972).

However, the determinative factor in most cases has been either the practical effect of discontinuing the discount (i. e., the prospect of a demand for corresponding wage increases) or a reluctance to interfere with the understandings reached between a utility and its employees. Our decision turns on the latter factor, although we are not unmindful of the significance of others discussed in the cases.

In *Central Maine Power v. Public Utilities Commission*, 153 Me. 228, 136 A.2d 726 (1957) we sustained Central Maine Power's appeal from a Commission ruling excluding certain promotional expenses from the revenue required. We there cited *West Ohio Gas Co. v. Public Utilities Commission of Ohio*, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935): "*[g]ood faith is to be presumed on the part of the managers of a business. . . . In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay.*" Similarly, we accepted the principle, articulated by the Supreme Court of Vermont, that

> *The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management.*

> *This rule is recognized in all of the cases. This matter of salaries and advertising expense calls for the exercise of judgment on the part of the management of the company. Good faith on its part is to be presumed. Although these expenses should be scrutinized with care by the commission they should not be disallowed or reduced unless it clearly appears that they are excessive or unwarranted or incurred in bad faith.*

*Petition of New England Tel. & Tel. Co.*, 115 Vt. 494, 66 A.2d 135, 145 (1949).

Employee discounts are indisputably a form of employee compensation. Whether directly incorporated within a collective bargaining agreement, or merely a standard and accepted pre-requisite of employment, such discount surely constitutes value given the employees by the Company in partial exchange for past or present services.[38] We, therefore, discern no good reason for distinguishing between management prerogatives respecting salaries recognized in our 1958 *Central Maine Power* decision and those applicable to the matter of employee discounts.

The employee discount at issue here does not constitute *"undue or unreasonable"* discrimination, prohibited by 35 M.R.S.A. § 102. Ruling on a challenge to telephone service discounts provided clergy, newspapers, municipalities, and employees, the Arizona Corporation Commission invalidated those in the first three categories, but held that the employee discount

---

**38.** Concurring in the majority opinion in *Re General Tel. Co. of Florida*, 19 P.U.R.4th 227, 267 (Fla.P.S.C.1977), Commissioner Bevis observed:

> Whether a person works for a small business, a large corporation, a governmental agency, or a regulated utility, it is almost universal practice for that person to receive some part of the total renumeration for his work in a form other than cash. Some common forms of this type of renumeration are partial or total payment of his group health and life insurance premiums, payment of a share of his unemployment compensation for workmen's compensation insurance, the grant of price discounts on the purchase of goods or services which that particular company sells, participation in retirement plans,

> reduced prices for meals in company lunchrooms, establishment of deferred compensation plans, provision of moving expenses for families, provision of tools and work clothes and many, many others.
>
> Some of these forms of renumeration are even required by law to promote the social well-being of the employee and his family. Whether these forms of renumeration are called concessions, fringe benefits, employee discounts, or some other name, and whether or not they are required by law, all of them accrue to the benefit of the employee. They have a bearing upon whether or not the person (management or craft) will trade his skills and work he can perform for a total package of renumeration (cash plus noncash).

*is not discriminatory as it is given in partial consideration to the employee for services provided to the company and can be justified on that basis.*

Re The Mountain States Tel. & Tel. Co., 8 P.U.R.4th 547, 556 (Ariz.C.C.1975). Moreover, the Legislature's specific exemption of, *inter alia,* a utility's employees from the prohibition in § 103 of *"rebate[s] discount[s] or discrimination"* adequately answers challenges premised on § 102.

There is some dispute whether, were a discount disallowed, a utility's expenses would ultimately be reduced. Nearly every commission upholding such discounts has concluded that denial of discounts would result in employee demands for equivalent compensation. *"Equivalent"* cash compensation, several commissions have observed, would in fact likely be more expensive than *"free"* service.[39] Whether this phenomenon would in fact occur is a *"question . . . not free from doubt." Re Chesapeake & Potomac Tel. Co., supra* at 315, citing 15 P.U.R.4th 302.[40] It is a question, however, that we find unnecessary to resolve.

The New York Public Service Commission, considering this issue some 25 years ago, concluded that abolition of the discount would not result in a saving to the public. They continued:

*That alone would be sufficient reason to refuse to prohibit the practice but this decision is not based on such narrow grounds.*

*The Commission has repeatedly asserted its position that it will not interfere with the collective bargaining rights which have become inherently part of our American system and that any payment or benefit given labor, in the absence of proof of bad faith, is presumptively a proper expenditure for fixing rates. Any effort on our part to curtail or limit a reduced telephone rate to employees would be as improper as if we were to attempt to fix the number of paid holidays or limit any other right which has been given as a result of an understanding between employer and employee.*

Re New York Telephone Co., 5 P.U.R.3d 33, 58 (N.Y.P.S.C.1954). *See also, Re Chesapeake & Potomac Tel. Co.,* 36 P.U.R.3d 417, 424 (W.Va.P.S.C.1960).

A regulatory commission owes a degree of deference to the judgment of management in the establishment of employee compensation packages. Where, as here, the road chosen by management is arguably at least as economical as any alternative, and the benefit does not clearly appear to be *"excessive, or unwarranted, or incurred in bad faith",* management's judgment must be respected. *Central Maine Power Co. v. Public Utilities Comm.,* 153 Me. 228, 244, 136 A.2d 726, 736 (1957).[41] *See Berry v.*

---

**39.** Dissenting from the Colorado Public Utilities Commission's conclusion that employee discounts are discriminatory, and that equivalent compensation would be *"insignificant"*, Commissioner Lundborg argued:

*This reason completely ignores the uncontradicted testimony of at least two witnesses that it would be necessary to* "gross up" *payments to employees in order to leave them in precisely the same economic position after discontinuance of concessions as before —i. e., to offset federal and state income taxes, sales taxes, social security, etc.—it would be necessary to pay the employees far more than the present nonbilled paper dollar value of the concession itself. The most conservative estimate of the* "gross up" *would be a substantial sum which—contrary to the public interest—must unreasonably be borne and paid by the general body of ratepayers.* Re Mountain States Tel. & Tel. Co., 95 P.U.R. 3d 130, 135–136 (Colo.P.U.C.1972) (Lundborg,

Comm. Dissenting); *See also, Re Chesapeake & Potomac Tel. Co. of Md., supra* at 303 (implicitly); *Re General Tel. Co. of Fla.,* 19 P.U. R.4th 227, 268 (Fla.P.S.C.1977) (Bevis, Comm. concurring).

**40.** In these two decisions the District of Columbia Commission reversed itself on the issue, finally determining that the discounts were justifiable as a matter of regulatory policy.

**41.** Although the Commission argues that its disapproval of the discount constitutes not interference with management but merely a policy determination, it contends in a footnote to its brief that the Company's action nevertheless falls within the standard cited here. Our examination of the record and of the Commission's findings does not allow us to accept that conclusion.

*Maine Public Util. Comm., supra* at 794; *Cf. Casco Bay Lines v. P.U.C.,* Me., 390 A.2d 483, 494 (1978) (liability insurance expense).

We need not, and do not, decide that the entire spectrum of matters relating to employee compensation is beyond the reach of the Commission's regulatory powers. We have clearly held to the contrary in the past. *See e. g., Casco Bay Lines v. Public Utilities Comm., supra* at 492–494. We hold only that we cannot find, in this record, any substantial evidence justifying the Commission's interference with a reasonable managerial judgment.

### CAPITAL STRUCTURE ISSUE

One of the primary functions of regulatory agencies in the ratemaking process is the determination of the appropriate rate of return to be allowed utilities under its jurisdiction. Rate of return, i. e., the annual return to be allowed on the value of the utility's property devoted to public use, is determined by combining the capital structure of the utility with the proper cost of capital. *Mechanic Falls, supra,* at 1095. In a lengthy discussion of the rate of return issue in *New England Telephone, supra,* we observed that

> [i]t can be seen that the cost of capital depends not only upon the individual cost of the different items [i. e., debt & equity] making up a utility's capitalization, but also upon the proportion of those individual items to the total capital structure.

390 A.2d at 39.

We also observed there that *"a higher 'debt ratio' means lower rate of return and lower rates to the utility's customers." Id.*

In the present case the Commission found that a capital structure containing 35 per-

cent common equity, 13 percent preferred and 52 percent debt was appropriate for Central Maine and should be used to determine its rate of return. The Decree stated:

> . . . *Central Maine's pro forma equity ratio of 36.6% is unreasonable and inefficient because it provides an excessive and unnecessary margin of safety which is being financed by ratepayers. For these reasons, we find that a capital structure containing 35% equity, 13% preferred, and 52% debt is appropriate and should be used to determine the fair rate of return.*[42]

Central Maine submits on appeal that this finding of unreasonableness was erroneous and without record support. Specifically, they contest what they contend is the Commission's inappropriate use of a hypothetical capital structure in lieu of their pro forma structure, which they insist was reasonable.

The Commission, in reply, argues alternatively that it found Central Maine's near term *pro forma* capital structure rather than a hypothetical one, but that in any event use of a hypothetical structure would be justified and supported by its findings.

We deny Central Maine's appeal on this issue, finding the Commission's use of a hypothetical capital structure to be reasonable and supported by substantial evidence.

In *Mars Hill & Blaine Water Co. v. Public Utilities Commission, supra,* we upheld the Commission's substitution of a 60/40 capital structure for the utilities'[43] actual 57/43 capital structure *"as constituting a reasonable exercise of the Commission's expert judgment".* 397 A.2d at 583. We did so after finding that *"[t]he record supports the conclusion that General Waterworks was attempting to shift to a 60/40 capital struc-*

---

**42.** The pre-filed direct testimony of Central Maine Power's Vice President for Finance, Mr. Webb, set the Company's pro forma equity ratio at 36.6%. During subsequent cross-examination Mr. Webb revised this figure to 36.-15 (rounded to 36.2%) to reflect intervening events.

**43.** All of the utilities involved were subsidiaries of General Waterworks Corporation, which

was in turn wholly owned by I.U. International Corporation. All parties agreed that, for reasons discussed *infra,* the capital structure of General Waterworks must be at least the starting point for analysis of the cost of capital for each of the subsidiary utilities. Thus it was considered the *"actual"* capital structure of the subsidiaries.

*ture and that the ratepayers have been incurring higher debt costs associated with the attempt." Id.* Ratemaking being prospective in nature, we said, *"facts which with certainty will gain life in the future, but do not affect the operations for the test year, must be weighed by the factfinder . . .." Id.* at 584, *quoting Central Maine Power Co. v. Public Utilities Comm.,* 153 Me. 228, 242, 136 A.2d 726, 735 (1957).

The Commission contends that it found and employed Central Maine's Power's near term pro forma actual capital structure rather than a hypothetical one, citing principles announced in *Mars Hill, supra.* A review of the record, briefs, and decision in that case, however, discloses no hint that the Commission argued—or this Court held—that the capital structure there imputed to the utilities was anything but hypothetical. Indeed, the Commission's brief to this Court in that case pointed out:

> *Because the Companies do not issue their own debt, their actual capital structure is 100% equity. All parties agree that a 100% equity capital structure would be unreasonable for ratemaking purposes. The issue, therefore, is what <u>hypothetical</u> capital structure should be imputed to these General Waterworks subsidiaries. Accordingly, since neither the Commission, nor the Company, is advocating the actual capital structure of these Companies for rate-making purposes, appellants' extended discussions of cases dealing with actual versus hypothetical capital structures are irrelevant.* [original emphasis].

Although we did not specifically refer to the capital structure used by the Commission as *"hypothetical,"* we referred to it as the *"appropriate"* one, as distinguished from the actual one. A *"hypothetical"* capital structure is not one created of thin air: for that reason the term is misleading. It is *"hypothetical"* only to the extent that it assumes, as it must, certain trends in the financing of the utility during the future

period for which rates are being set. It must, however, be based in present fact and future probability, which in the ordinary case means that the present actual capital structure of the Company must be the starting point for analysis.

Thus, in *Mars Hill,* the Commission considered the 57/43 (debt/equity) capital structure of General Waterworks, but determined that because General Waterworks was clearly attempting to shift to a 60/40 capital structure (and that ratepayers had been incurring higher debt costs as a result) that structure was the *"appropriate"* one to use for cost of capital determination.

The line between the use of a *"hypothetical"* capital structure and an *"actual"* one constructed taking into account anticipated changes is a blurred one. Depending upon the degree of certainty which prospective changes present,[44] either a *"near term actual pro forma"* or a *"hypothetical"* capital structure may be found, and either may, in proper circumstances, be within the Commission's discretion. As we suggested in *Mars Hill,* our approval in *New England Telephone* of two *"well-recognized"* situations in which a capital structure other than the actual test-year one may be used was neither comprehensive nor exclusive. There may be *"case* [s which] *do not fit precisely into either category,"* 397 A.2d 583, yet in which the use of other than the actual capital structure may represent a reasonable exercise of the Commission's expert judgment supported by the record.

In the present case, use of a 35% equity ratio, though premised on probably future trends in Central Maine Power's financing, must be considered hypothetical. Staff witness David Kosh presented testimony concerning both the Company's pro forma capital structure and a *"desirable"* one containing a lower equity figure. After presenting his pro forma study, he noted that ". . . *it is clear that the fair rate of return should be based on the appropriate capital structure as opposed to the actu-*

---

**44.** For this reason, the *"facts which with certainty will gain life in the future"* found in *Mars Hill* place it closer to an *actual* capital structure than might be the case in which the predicted changes are less assured.

*al one.*" (emphasis added). The Decree reviewed both structures, and concluded that the *"desirable"* one containing 35% equity was *"appropriate and should be used . . . ."*

The question remaining, therefore, is whether the Commission's determination is *"reasonable in result and methodology and supported by substantial evidence."* New England Telephone, *supra*, at 34.

The Commission's use of a 35 percent common equity ratio was based on its conclusion that while CMP's actual year-end equity ratio has gradually increased, from 30.64 percent in 1974 to 33.95 percent in 1977, that trend will cease in the short-term future.

The testimony of Mr. Kosh, president of a utility consulting firm, is the primary basis of the Commission's finding in this regard. Kosh presented a study of the capital structures of 64 original cost electric utilities, concluding that their average year-end equity ratio in 1976 was 34.1 percent; at year-end in 1977, 35.5 percent. He concluded, in part on the basis of this study, that CMP's pro forma 36.6 percent equity ratio was *"above the zone of reasonableness,"* and advocated the 35.0 percent figure subsequently accepted.

Aside from considerations of economy to ratepayers, however, the Commission is bound to give weight to the issue of safety to investors. With this in mind, Mr. Kosh studied the safety of a capital structure with a 35 percent equity ratio, and concluded that it could withstand a decline in earnings so severe as to have only a 1–in–100 chance of occurrence, and still produce an after-tax interest coverage of over two times. This study, based on historical data concerning CMP's rate earned on total capital during the period 1969–1977, led Mr. Kosh to conclude:

> Thus, in my opinion, a 35% equity ratio for Central Maine Power would lie at the upper end of the range of reasonableness.

If anything, then, Central Maine Power's equity ratio which is in excess of 35% is somewhat above the upper end of the range of reasonableness.

On cross-examination, counsel for Central Maine Power suggested that the periods 1970–77 and 1972–77 be used in the safety study, as they had produced the greatest fluctuations in return for Central Maine Power from 1960–1977. Recomputing the study, applying the same 1–in–100 disaster test, the after tax coverages were 1.98 times for 1970–77 and 1.97 times for 1972–77. The Commission accepted this study as evidence of the safety of a 35% equity ratio.

Central Maine Power does not contest the Commission's finding that a 35 percent equity ratio is safe, as Mr. Kosh's studies indicate. Likewise it does not (and logically cannot) contest that fact that a 36.6 percent (or 36.15 percent) equity ratio is more expensive to ratepayers. It relies instead upon the claim that the capital structure of a utility is a function of management, *citing In Re Stratton Water Co. Proposed Increase for Rates*, Me., 383 A.2d 1373, 1377 (1978), and that the Commission lacked sufficient evidence to support its finding that the Company's pro forma 36.6 percent equity ratio was *unreasonable.*

To this end, it also attacks the probity of the evidence relied upon by the Commission. Mr. Kosh, the Company contends, compared Central Maine Power's capital structure pro forma to year-end *1978* with the capital structures of 64 electric companies in *1976.* At year end 1976, the Company claims, its common equity ratio was 32.5 percent, placing it in the mainstream of Kosh's figures for that date.[45] However, the Company continues, testimony of its witnesses established an industry-wide increase in common equity ratio after 1976, so that at year-end 1977 the breakdown of Kosh's 64 companies produced an *average* common equity ratio of 35.5 percent, *above* his range of reasona-

---

**45.** As of 1976, Kosh testified, the common equity ratio's for companies in his study broke down as follows:

26 Companies: 35% or above
30 Companies: 30% to 35%
8 Companies: Below 30%

bleness.[46] Kosh's figures, Central Maine argues, do not reflect market realities. Citing the American Bar Association's *Annual Report of the Section of Public Utility Law* (1978) at 236, they point to a year-end 1977 average of 36.3 percent common equity, the highest since 1968.

The Commission responds to the citation of the American Bar Association Section *Report* by noting that short-term debt is excluded from the figures presented there, a condition which tends to inflate the equity ratio. If the companies in that report had short-term debt relatively comparable to Central Maine Power, the Commission notes, average equity ratio at year-end 1977 would have been 35.2 percent—far closer to the 35.0 percent advocated by Kosh and accepted by the Commission than the 36.6 percent (adjusted to 36.15 percent) suggested by the Company.

This plethora of conflicting evidence illustrates the wisdom of our long-standing policy of according the Commission considerable deference in the realm of economic fact-finding.[47] This Court possess neither the resources, the expertise, nor the inclination to act as a *"super-commission."* We cannot substitute our judgment of the economic facts presented for that of the Commission. We cannot say, on the basis of the evidence presented, that the Commission could not reasonably conclude that a 35 percent equity ratio was proper. The challenges to Kosh's testimony reviewed here were made known to the Commission; it would not be unreasonable for them to reject them as unpersuasive. Assuming *arguendo* that the upper end of Kosh's *"range of reasonableness"* should have been, e. g., 37 percent rather than roughly 35 percent, that would not prevent the Commission from concluding that a 35 percent equity ratio was proper. Many other variables bearing on Central Maine Power's peculiar case had to be considered than could neatly be settled by evidence of industry averages alone. It

would not be unreasonable for the Commission to conclude, for example, that equity ratios had peaked and would decline in the near future, or that Central Maine's financing plans mandated a lower ratio than might prevail on the average. Such are the judgments entrusted to the Commission. The requirement that they be supported by substantial evidence does not demand that they be absolutely uncontested.

The reasonableness of using a given ratio of capital structure cannot be judged in the abstract, but must be compared and contrasted with alternatives. Indeed, the very process of determining what is *"reasonable"* is one of selecting from among competing alternatives the choice which presents the optimal combination of necessary qualities. Thus, while an equity ratio of X may present greater economy to ratepayers, it is an unreasonable choice if it does so at the expense of safety to investors. Conversely, a higher equity ratio of Y could be exceedingly attractive to investors, but at inordinate cost to the ratepayers, and would thus be unreasonable.

Ratemaking is an inexact science, fraught with the dangers which accompany all processes of prediction, economic or otherwise. Accordingly, there must be said to be theoretically a *range* of reasonableness in such matters, rather than an exclusive choice. *Central Maine Power v. Public Utilities Commission*, Me., 382 A.2d 302 (1978). That range may be said to parallel the Commission's discretion, and it is accordingly their right to choose from among alternatives, all arguably within the range of reasonableness, that one which is *most* reasonable, i. e., that one which presents the optimal combination of economy and safety. That is what we anticipated in *New England Telephone, supra*, when we approved use of a hypothetical capital structure by which *"rates . . . [could be] determined on the basis of a more reasonable and less expensive capital structure."* 390 A.2d at 39 (Emphasis added).

46. The 1977 breakdown, according to Central Maine Power, was as follows:
 35 Companies: 35% or above (average 38%)
 25 Companies: 30% to 35%
 4 Companies: Below 30%

47. *See, e. g., New England Tel. & Tel. Co. v. Public Utilities Commission, supra*, 390 A.2d at 37–38; *Casco Bay Lines v. Public Utilities Commission, supra*, 390 A.2d at 490; and cases cited therein.

In the present case the Commission chose a 35 percent equity ratio—near the upper end of the *"zone of reasonableness"* constructed by staff witness Kosh. It did so on the basis of substantial evidence. Among the factors considered were prevailing ratios in comparable utilities; historical trends in Central Maine Power's financing; its announced intentions with respect to capital additions; and the impact of a severe earnings decline on a structure with a 35 percent equity ratio.

The Commission was *not* required to show that Central Maine Power's pro forma capital structure was unreasonable in any *absolute* sense, but only in comparison to available alternatives. Where substantial evidence supports the Commission's findings that a lower equity ratio offers greater economy to ratepayers and sufficient safety to investors, it is clearly more reasonable. In selecting from among the choices presented by the range of reasonable alternatives, it acted reasonably.

The Company relies heavily on its claim that *"the function of the Commission with respect to capital structure 'is one of control and not management',"* citing *In Re Stratton Water Company Proposed Increase In Rates, supra.* The quoted portion is excepted from a broad statement of principles concerning managerial discretion in general; the Company here seeks to extend it beyond its limitations.

*Stratton* presented a rather peculiar fact situation. We there said only that management was entitled to have a note it held endorsed and exchanged for stock (thus transferring debt capital to equity capital) rather than discharged, since cancellation would have *altered* Stratton's capital structure *"in such a way as to lessen [its] fair rate of return."* *Id.* Management, we concluded, could properly choose to protect its right to a return, rather than provide a windfall to ratepayers. Finding such judgments to be a prerogative of management is a far cry from saying that as respects the prediction of future capital structure, requiring assessment of enormously complex contingencies—many beyond the control of management—managerial judgments must be deferred to. To do so, as the Commission warns, could be to force the Commission to abdicate its supervisory responsibility in this area:

> *Central Maine's equity ratio has slowly increased each year since 1974 in relatively small amounts and the Commission noted its concern about this trend. [. . .] Central Maine suggests that the mere fact that the 36.6% or the 36.2% ratio is close to 35% precludes the Commission from disturbing this "function of management."*

> *If, indeed, the Commission cannot use a 35% hypothetical equity ratio because it is too close to the "actual" 36.2% equity ratio, that would, perforce, imply that a 36.2% equity ratio produces "just and reasonable" rates. The implication is clear. Under such reasoning the Commission would not have regulatory control over companies as long as the equity ratio rises by small increments.*

It is not a proper *"function of management"* to choose excessive safety at the cost of higher rates.[48] Central Maine has not, in its briefs to this Court, contested the validity of Mr. Kosh's study demonstrating the coverages produced with a 35 percent equity ratio in the face of even a severe earn-

---

48. As the District of Columbia Public Service Commission has held:

> *[w]hile we clearly recognize that the composition of the capital structure is a matter for the utility's management to decide, and that a utility has a right to maintain a low debt ratio for its own purposes, we also perceive that it is our duty in rate-making proceedings to ignore any capital structure which is not conducive to the lowest cost of service that is consistent with a sound financial posture.*

*Re Chesapeake & Potomac Tel. Co.*, 57 P.U. R.3d 1, 39 (D.C.P.S.C.1964), *aff'd sub nom. Telephone Users Association, Inc. v. Public Service Comm. of the District of Columbia*, 271 Fed.Supp. 393 (D.D.C.1967), *aff'd*, No. 21, 318 (unreported) (D.C. Cir. Oct. 21, 1968), *cert. den.*, 395 U.S. 910, 89 S.Ct. 1742, 23 L.Ed.2d 223, *rehearing den.*, 395 U.S. 987, 89 S.Ct. 2127, 23 L.Ed.2d 776 (1969).

ings decline. If a 35 percent ratio is safe, is obviously more economical to ratepayers, and is otherwise found reasonable by the Commission, we cannot say that it was erroneous.

4. Land Held For Future Use Issue

The remaining issue with respect to Central Maine Power's revenue requirements is the Commission's treatment of the utility's Land Held for Future Use (LHFU) and Investments in Joint Corporate Projects (IJCP) accounts. The Commission's action as to this issue is contested by the Consumer Action Coalition, while Central Maine Power joins with the Commission as an appellee.

In its original filings in this case Central Maine Power proposed to include in its rate base all of the property held in its LHFU and its IJCP accounts. The Commission excluded two parcels of land, allocable to these accounts, located in Stockton Springs and in Richmond, Maine. The Commission determined that Central Maine Power had not demonstrated any *"definite plan to use these two properties at any point in the foreseeable future."* [49]

The Commission included 81 percent of Central Maine Power's property on Sears Island, finding the Company had demonstrated a sufficiently definite plan for its use as a site for a coal-fired generating plant.[50] Central Maine Power has not appealed from these exclusions or adjustments.

The Commission made no explicit findings as to any of the other properties included in the two accounts. Instead, finding no record evidence of either the existence or non-existence of definite plans for the properties, the Commission concluded that they should be included in rate base.[51] The Consumer Action Coalition now contends that the Commission erred by including these properties in the absence of an affirmative showing by Central Maine Power of a definite plan for their proposed use.

We deny the Coalition's appeal.

A review of the record discloses that the only issues raised in proceedings below regarding property held for future use which was ultimately included in rate base concerned the Sears Island property.[52] The Coalition now concedes the propriety of Commission action with respect to Sears Island, and challenges only its determination to include, without evidence of specific development plans, some forty-three relatively small items representing an average year-end investment of $657,000 out of a total rate base of $514,032,000.

■■■ The failure of the Coalition to raise before the Commission [53] the issue now presented to this Court—the proper allocation of the burden of proof with regard to inclusion of such properties—precludes it

---

**49.** Stockton Springs was characterized as a *"future/alternative site for steam generation"* whose earliest possible operational date was in the late 1980's. Richmond was considered a possible site for a nuclear plant. The earliest date for putting this land into service was said to be 1991, although Central Maine Power admitting that target was becoming less realistic. The Commission concluded it would not *"burden ratepayers for an indefinite period with paying a return on Company assets which confer no immediate benefit on and provide no guarantee of future benefit to Central Maine's ratepayers."*

**50.** Only 81 percent of the Sears Island property was included in rate base since that was the percentage of the plant which would ultimately be owned by Central Maine and placed in service for its ratepayers' benefit.

**51.** The Commission did, however, place Central Maine Power and other utilities on notice that

in the future they would bear the burden of showing affirmatively the existence of a definite plan of proposed use for each property in the two accounts.

**52.** The Commission Staff had recommended an adjustment be made for the Richmond property similar to that made as to Sears Island. The Commission exclusion of the Richmond property in toto, however, removes that issue from contention.

**53.** At the close of hearings briefs were filed in which the Coalition advanced a *policy* argument urging the Commission to disallow *all* of the property held for future use for lack of definite plans for use. No mention was made, however, of the *legal* argument now raised concerning a utility's burden of proof as to such properties.

from advancing it here. As we have repeatedly held with respect to trial court procedure:

> It is an acknowledged principle, and one generally followed by this Court as necessary to a sound appellate practice, than an issue raised for the first time at the appellate stage will be denied cognizance in the appellate review of the case. Walsh v. City of Brewer, Me., 315 A.2d 200, 209 (1974) (citations omitted).

As we more recently noted, the principle applies with equal force to proceedings before the Public Utilities Commission:

> A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action. Casco Bay Lines v. Public Utilities Commission, Me., 390 A.2d 483, 487 (1978) (per curiam), quoting Unemployment Compensation Commission of Alaska v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946).

■ Neither can the Coalition contend that the mere existence of the properties, and the necessity of some action either including or excluding them from rate base, itself raises the burden of proof issue. Decisions of this Court as well as of the Commission and other regulatory bodies makes clear that merely filing for a rate increase does not automatically place a burden on the utility with respect to every item of every account. While the utility has the burden of establishing the overall justness and reasonableness of its proposed rates, absent some prior notice it cannot be called upon to account for every allocation made, property purchased, or other action taken. Central Maine Power Co. v. Public Utilities Commission, 156 Me. 295, 325, 163 A.2d 762, 778 (1960); See also Re Consumers Power Co., 14 P.U.R.4th 1 (Mich.P.S.C.1976); Re Chesapeake & Potomac Telephone Co., 57 P.U.R.3d 1 (D.C.P.S.C.1964).

The issue not having been passed upon by the Commission, it must be denied appellate cognizance.

### III.

### RATE DESIGN

#### 1. Uniform Percentage Increase

The design among rates, as well as the revenue level they will generate, is a facet of Commission ratemaking. Central Maine Power v. Public Utilities Commission, Me., 382 A.2d 302, 324 (1978). In the present case rate design issues occupied a substantial portion of the proceedings below. All of the intervenors were primarily concerned with rate design, and Central Maine's proposed increase envisioned not only increased revenues but a realignment of the relative positions of the rate classes such as would increase the rates of some classes more than others. It is the Commission's action in rejecting this proposed realignment which serves as the basis for appeal with respect to the Commission's rate design decisions challenged here.

Central Maine Power, on the basis of a cost-of-service study produced by its Director of Rates, Mr. Frederick Anderson ("the Anderson study"), filed proposed rates designed to increase overall revenues by approximately 12.5 percent, with increases in individual rate classes ranging from 3.7 percent to 17 percent. The Company argued that such disparate increases were necessary to decrease the existing differential among those customer groups producing a rate of return close to or above the overall return, and those producing a return below the overall average.

The Anderson study was based on a 1977 test year using eight months actual and four months estimated data, later recomputed on the basis of actual 1977 test year data. The study used a "coincident peak method" for allocating to the various customer classes certain demand costs associated with power supply. Under this method, costs were allocated to each class based upon its contributions to the single one hour annual system peak.

The Commission rejected the Anderson study, however, and, finding no evidence in

support of a realignment of classes not based on that study, determined to make no change:

> We find that the use of the one hour coincident peak method for allocating demand costs is so flawed and yet is so significant in the overall result of the cost of service study that we are unable to rely on the study as a basis for allocating the revenue increase among the various rate classes. Were the "90% of peak" method we have found to be fairer to be used, it is conceivable that the returns earned from the various classes would be very different from the figures the Company has presented to us. But we have no way of knowing what they would be.
>
> Having rejected the cost of service study as a basis for allocation of the revenue increase, we are left in the position of having to make allocations without the aid of any competent cost evidence. Under these circumstances, we find that the only reasonable and fair result is to require that rates be designed so as to give all classes of service the same percentage increase over total test year revenues.

Intervenor-appellant St. Regis Paper Company (St. Regis) contends that this uniform percentage increase was arbitrary and capricious, not supported by substantial evidence, and erroneous as a matter of law. In particular, it attacks the Commission's rejection of the Anderson study in the absence of an alternative proposal. Central Maine Power, nominally an appellee as to this issue, concurs with St. Regis.

We may initially conclude that the Commission staff's failure to present a direct case on the proper allocation of the revenue increase among the rate classes does not constrict the Commission's freedom of decision. Even the uncontradicted evidence of the utility may be weighed, critically examined, and rejected if deemed necessary. *Main Water Company v. Public Utilities Commission,* Me., 388 A.2d 493, 496 (1978). Moreover, our decision in *Maine Motor Rate Bureau,* Me., 357 A.2d 518 (1976) does not require the Commission to

accept an uncontroverted allocation study if the evidence supports its rejection. 357 A.2d at 528. Whether the Commission's rejection of the Anderson study and imposition of a uniform increase was reasonable and supported by *"substantial evidence"* is thus the sole basis of the alleged error.

Faced with a similar challenge to the Commission's rejection of a utility's proposed rate design, we concluded in *New England Telephone, supra,* that the issue need not be decided in view of our disposition of other issues presented by the appeal.

We reach the same conclusion here.

Our decisions respecting the Commission's treatment of taxes deferred by accelerated depreciation and its exclusion from allowed operating expenses of the employee discount will substantially affect the ultimate revenue level allowed Central Maine, which will be required to file proposed rate schedules to generate this new level. Central Maine may choose to seek a uniform percentage increase, or to present revised studies supporting realignment; the Commission may find such studies persuasive, or may otherwise accept some form of realignment. We cannot know now the outcome of such contingencies. Nothing we might say now respecting the Commission's action as to this issue would necessarily have force in light of future events. Accordingly, we decline to express any opinion as to the propriety of the Commission's action on this issue.

### 2. Residential Rate Design

### A. Customer Charge

Establishing cost of service for rate design is a complex process. The methodology employed here by Central Maine, and adopted by the Commission as to this issue, entails three steps. All of Central Maine Power's costs are first designated according to their *"function"*, i. e., power supply, transmission, subtransmission or distribution. Each of these functionalized costs is then *"classified"* according to its demand, energy or customer components. Finally, all costs are *"allocated"* among the various customer classes by use of allocation fac-

tors, which are derived by various methods depending upon the function and classification of the cost.[54]

 In the proceeding below, as a complement to its decision to discard the existing *"declining block rate"* structure [55] and impose a flat energy rate, the Commission established a $5.70 monthly customer charge. The Consumer Coalition and the Natural Resources Council of Maine, intervenors below, challenge that action. Specifically, they dispute the classification of certain parts of the distribution system— sometimes called the *"minimum"* or *"phantom"* distribution system—to customer costs. These costs, they argue, are properly classified to demand rather than customer costs, a revision which they contend would lower the monthly customer charge from $5.70 to $3.15.

The Commission argues that while the intervenors' proposed design—which seeks to track as closely as possible the *marginal* energy and demand costs of producing electricity—may have merit, it faced the *"different problem"* of producing an equitable rate structure once declining block rates had been abolished.

Prior to the rate proceeding presented for review here, Central Maine Power charged each residential customer $3.40 per month for customer costs. This *"minimum bill"* included the right to use 25 kilowatt hours of energy at no additional charge. In its original filings, Central Maine proposed increasing that customer charge to $4.00 and providing no *"free"* energy at all. At the same time, the Company observed that while its actual customer cost was *"considerably more"* per month, the difference would be recovered in the first energy blocks of their proposed declining block-rates.[56] When the Commission suggested the use of a flat energy rate, Central Maine Power witness Anderson stated that in that event the customer charge should be $5.68.

The Commission ultimately found that *"if there ever was a cost justification for declining blocks, that justification no longer applies to residential customers, and, therefore, . . . the declining block structure should be eliminated from the residential class rate."* [57]

The Commission, therefore, determined to accept Central Maine's customer cost figure of $5.68, rounded to $5.70, as the residential customer charge to be assessed in connec-

54. Demand-related costs, for example, are allocated by several different methods, one of which is the *"coincident peak"* method. It was the Commission's conclusion that such allocation produced an unrepresentative cost of service which led to its rejection of the Anderson study and the imposition of a uniform percentage increase. The dispute as to the present issue concerns the *classification* of certain costs as customer-related.

55. *See Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302, 327–28 (1978) for a discussion of this variety of rate structure.

56. In its Decree the Commission explained this phenomenon:
 *To the extent that the actual customer cost exceeds the customer charge, the difference has apparently been recovered in the first few blocks of the declining block rate. This means that the charge for a kilowatt hour in those blocks includes a charge for the energy itself; some charge for demand, as discussed above* [see note 57 post.]; *and a charge for that portion of the customer cost which is not actually charged to each customer indi-*

*vidually. Thus, as a customer's energy use progresses through the various blocks, the customer is helping to pay the actual customer cost of other customers' as well as his own. The more energy a customer buys, the more of these costs he pays.*

57. The Commission rejected the two traditional justifications for declining block rates, namely, (1) lower use energy blocks recovered the customer costs not included *"up front"* in the customer charge, and (2) higher-use customers have been thought to have less demand (judging by system peak) than lower-use customers, and demand costs were assessed in the lower-use energy blocks so that lower-use customers would pay their proportionate share. The only remaining justification, the Commission concluded, would be that the energy charge included some customer costs. Finding it inappropriate, as noted in n. 56, *supra,* to allow intra-class subsidization of customer costs, the Commission chose to assess a higher *"up front"* customer charge in order to move to a flat-rate energy charge. No party to this appeal contests the Commission's decision to do away with the declining block structure.

tion with the new schedule employing flat energy rates.

There is little dispute over the definition of what costs should be classified as a customer cost. The Company defines customer costs as

> . . . *fixed* costs which vary on a total company basis with the number of customers serviced and . . . not . . . with demand (*KW*) and energy (*kwh*) consumption. In addition, these costs have no time dimension at all.

Or, as the Commission Decree paraphrases it, *"costs that vary with the number of customers in the rate class, regardless of the energy or demand use."* The Consumer Coalition seeks to refine the definition somewhat by citing Professor James Bonbright to the effect that the customer charge should be composed only of those costs which are *clearly* allocable as such and which vary *directly* with the number of customers regardless of consumption. Bonbright, *Principles of Public Utility Rates*, 347–348 (1969). These nuances are of some significance to the intervenor's arguments.

In any event, the major dispute focuses upon determining which costs meet this general definition and should thus be included in the customer charge. No party disputes inclusion of such items as meters and meter reading, billing and customer service costs. What is hotly contested is inclusion of a *"minimum distribution system"*, consisting, according to the Commission, of *"a minimum amount of poles and wires needed, on average, to connect a residential customer to the Company's distribution system."*

In its Decree the Commission quoted Professor Bonbright, *supra*, at some length as to the propriety of including the minimum distribution system costs in customer costs:

> But the really controversial aspect of customer-cost imputation arises because of the cost analyst's frequent practice of including, not just those costs that can be definitely earmarked as incurred for the benefit of specific customers but also a substantial fraction of the annual maintenance and capital costs of the secondary (low-voltage) distribution system—a fraction equal to the estimated annual costs of a hypothetical system of minimum capacity. The minimum capacity is sometimes determined by the smallest sizes of conductors deemed adequate to maintain voltage and to keep from falling of their own weight. In any case, the annual costs of this phantom, minimum-sized distribution system are treated as customer costs and are deducted from the annual costs of the existing system, only the balance being included among those demand-related costs to be mentioned in the following section. Their inclusion among the customer costs is defended on the ground that, since they vary directly with the area of the distribution system (or else with the lengths of the distribution lines, depending on the type of distribution system), they therefore vary indirectly with the number of customers.

> What this last-named cost imputation overlooks, of course, is the very weak correllation between the area (or the mileage) of a distribution system and the number of customers served by this system. For it makes no allowance for the density factor (customers per linear mile or per square mile). Indeed, if the company's entire service area stays fixed, an increase in the number of customers does not necessarily betoken any increase whatever in the costs of a minimum-sized distribution system.

> While, for the reason just suggested, the inclusion of the costs of a minimum-sized distribution system among the customer-related costs seems to be clearly indefensible, its exclusion from the demand-related costs stands on much firmer ground. For this exclusion makes more plausible the assumption that the *remaining* cost of the secondary distribution system is a cost which varies continuously (and, perhaps, even more or less directly) with the maximum demand imposed on this system as measured by peak load. Bonbright, *Principles of Public Utility Rates*, *supra*, at 347–348 (1961).

While recognizing the difficulties of properly allocating the minimum distribution system costs, the Commission found inclusion of such costs as customer costs to be the most reasonable solution, saying:

*We find that the most cost-related rate structure for the residential class is one that recovers the full customer cost in the customer charge and the demand and energy costs in a uniform charge for every kilowatt-hour consumer. We find that there is no justification for continuing to use a declining block rate structure for this class. We direct Central Maine to file a residential rate with a minimum customer charge of $5.70 and a flat energy charge designed to generate the necessary revenues for the residential class.*

Challenging this action, the Consumer Coalition points to the same passage by Professor Bonbright as authority for the proposition that these costs (of the minimum distribution system) are basically unallocable according to the usual standards, and hence must be allocated according to the policy goals the Commission seeks to attain. Instead of doing so, the Coalition charges, the Commission made the purely conclusory statement that allocation to customer costs "*is reasonable*," while providing no supporting findings. Such action, it argues, is arbitrary and contrary to expressions of policy contained in the Commission's decrees and in state and federal legislation. The Natural Resources Council joins in this argument, and notes particularly that Professor Bonbright's conclusion that the lesser of two evils was to include the minimum distribution system costs in customer costs was made in the context of

an electric industry with *decreasing* marginal costs, a situation which has since been reversed. Facing the same issue today, the Council urges, Bonbright would have supported allocating costs of the minimum distribution system to the energy charge, to help achieve marginal-cost based rates. The Commission, in the Council's view, eliminated the declining block structure because it discriminated in favor of electric space heating customers, then inexplicably perpetuated that discrimination by raising the customer charge.[58] By accepting Central Maine Power's cost-of-service study figure for actual customer charges, the Council says, the Commission erroneously assumed it would be left with actual energy charges and therefore appropriate price signals. In fact, they argue, the energy charge has been priced below the Company's incremental cost of providing service, thus moving away from cost-based rates. Now, the Council insists, the energy charge will be whatever revenue requirements dictate, irrespective of any relationship between that charge and the true incremental cost of providing service. "*Appropriate price signals*" do not result, since the customer charge affects only the choice whether to take service, and does not affect consumption patterns.

A redesign of residential rates along the lines suggested by the Consumer Coalition and the Natural Resources Council is not without merit. The path chosen by the Commission is not without faults. According the Commission due deference in light of its legislative function and expertise, however, we find the result reached and the

---

58. The Council's brief presented the following illustration of its point:

*Mr. Thurlow, President of the Company, estimated that the average electric space heater uses 15 to 20,000 kwh annually. (App. 136–137). [But see, n. 37 supra.] Assuming a winter-month usage of 3,000 Kwh for such a customer, his total bill for that month would be (3000 × 2.196¢ plus $5.70 customer charge) $71.58 (plus fuel for generation charges). (App. 280) His resulting cost would be 2.386¢ per Kwh. A typical residential ratepayer using 600 Kwh that same month would have a total bill of (600 ×*

*2.196¢ plus $5.70) $18.88 or 3.146 per Kwh. Had he conserved and only used 400 Kwh, his bill would be $14.84 or 3.621¢ per Kwh. Under the discriminatory and allegedly discarded declining block rate, the 3000 Kwh customer would have paid $62.63 for an average Kwh cost of 2.088; the 600 Kwh customer $23.81 or 3.968. In this particular instance, under the new rates, the discrimination would be reduced but remain substantial; at very low use levels, the discrimination obviously will have increased inasmuch as the $5.70 charge is much higher than the $3.40 charge for the first 25 Kwh.*

methodology used to be reasonable, and the rate design to be supported by substantial evidence. *Mars Hill, supra*, at 588.

Marginal cost pricing, as a rate design methodology, attempts to reflect a utility's incremental (or decremental) cost of providing one more (or one less) unit of electricity at a given moment. Although in the forefront of many contemporary reevaluations of electric rate structures, it is not without its difficulties, most notably that "[t]here *are enormous definitional problems in determining what is and what is not a marginal cost.*" A. C. Aman, Jr. & G. S. Howard, *"Natural Gas and Electric Utility Rate Reform: Taxation Through Ratemaking?"* 28 *Hastings* L.J. 1085, 1090 (1977). Before the Commission, marginal costs were defined variously as the cost of producing an additional unit of output and as the first derivative of average cost. Three different calculations of marginal costs, each showing substantially different results, were presented the Commission. It was reasonable for the Commission to decline to attempt implementation of marginal rates, given such difficulties.[59]

Recovery of fixed customer costs, including those attributable to the minimum distribution system, through a $5.70 customer charge was also reasonable, and supported by substantial evidence.

No party contests Central Maine's establishment of the $5.68 composite customer cost figure, nor disputes that some of that cost was once *"hidden"* in the declining block structure. As noted, the focus of dispute is upon proper classification of those costs, particularly those of the minimum distribution system. The Commission, having opted for a flat energy rate, faced

the option of classifying such costs to the energy charge (raising the price per kilowatt hour) or segregating them in a distinct charge. The testimony of Mr. Anderson was that elimination of the customer charge and classification of those costs to energy would require an energy charge of 3.16 cents per kilowatt hour, while use of a $5.68 customer charge would allow the energy charge to be set a full 1 cent lower. Central Maine Power presented the following chart illustrating the cross-subsidization which would result from imbedding customer costs in the energy charge.

| | CUSTOMER COST | | REVENUE EXCESS |
| KWH | Actual | Recovered | (Deficiency) |
| --- | --- | --- | --- |
| 0 | $5.68 | $ 0 | (5.68) |
| 25 | 5.68 | 0.25 | (5.43) |
| 100 | 5.68 | 1.00 | (4.68) |
| 500 | 5.68 | 5.00 | (0.68) |
| 1000 | 5.68 | 10.00 | 4.32 |
| 2000 | 5.68 | 20.00 | 14.32 |
| 5000 | 5.68 | 50.00 | 44.32 |
| 10000 | 5.68 | 100.00 | 94.32 |

Obviously, high-use customers would be (unknowingly, in most cases) subsidizing low-use customers. While conservation of electricity is an undisputed goal, it cannot be the justification for discrimination of this sort. So, too, although flat rates for energy are perhaps less effective in encouraging conservation than some other methods might be,[60] they are reasonable when used in conjunction with a customer charge which properly assesses the cost of being tied to the electric service system.

Substantial evidence supports the Commission classification of minimum distribution system costs to the customer charge. The NARUC Cost Allocation Manual[61] recognizes two methods of determining the

---

**59.** In this respect the rejection of a residential rate structure such as that proposed by the Coalition or the Council is similar to the Commission action taken in the 1978 *Central Maine* case, *supra*, 382 A.2d 302, 326–28. There, intervenors had urged the Commission to discard the *"declining block"* system, and it had declined to, principally for lack of adequate information from which to fashion a substitute design. Here, the Commission abolished declining blocks, but declined to go further and implement marginal-cost based rates. Our ra-

tionale in upholding the Commission action there applies with equal force in the present case.

**60.** *See, e. g.,* the discussion in 28 *Hastings Law J.* 1085, 1088–1113 (1977), supra.

**61.** Doran, Hoppe, Koger & Lindsay, *NARUC Electric Utility Cost Allocation Manual* (1973), NARUC is an acronym for the National Association of Regulatory Utility Commissioners.

customer cost component of distribution system plant: the minimum size and minimum intercept methods. Central Maine Power used the minimum size method, which entails classification of a minimum distribution system to customer costs.[62] Significantly, a Consumer Coalition witness conceded on cross-examination that his proposal to classify distribution plant cost to demand related cost was not recognized in the *NARUC Manual,* while use of the minimum size method was.

The Commission was faced with the task of allocating what it termed *"basically unallocable"* costs. The testimony and evidence supporting classification of the minimum distribution system to customer costs was substantial. The *NARUC Manual* approves such a choice, and not the intervenors' alternative. Professor Bonbright criticized inclusion in customer costs, but rejected inclusion in demand costs with at least equal fervor. Though the costs of the minimum distribution system vary, at best, only indirectly with the number of customers served, they do not vary *at all* with demand or energy, leaving the Commission only a Hobson's choice with respect to the allocation of these costs.

Facing this dilemma, the Commission was entitled to exercise reasonable discretion in selecting a methodology to account for these costs. Classifying them to the customer charge, in order to implement flat energy rates without exacerbating existing cross-subdization, was a reasonable exercise of that discretion. The use of averaging to produce a flat energy charge which will produce the necessary residential revenue requirement, while perhaps lacking in precision, is a reasonable technique producing a reasonable result. Adoption of the policy urged by the intervenors of classifying the costs of the minimum distribution system to the energy (demand) charge would be equally imperfect, and Commission discretion must, therefore, carry the day. *New England Telephone, supra,* at 59 (1978).

### B. Seasonal Rates

The Natural Resources Council of Maine, supported by testimony of its expert witness, Dr. Richard S. Bower, proposed to the Commission that two different residential rates be implemented: a higher one for the November through February heating season, and a lower one for the remainder of the year. The Commission rejected the proposed differential, and the Natural Resources Council appeals.

Relying on a marginal cost analysis conducted for Central Maine Power by the National Energy Research Association (NERA), Doctor Bower concluded that the marginal cost of service varied by season,[63] and that a seasonally-differentiated rate was the proper method of reflecting that differential and producing cost-based rates. Doctor Bower's methodology for determining marginal costs per kilowatt-hour for each season was straight-forward. He adopted the NERA study's calculations as to the marginal demand-related unit costs, as to marginal energy costs, and as to allocation factors for each pricing period (November-February and March-October). Using information on residential load and total residential energy sales, Doctor Bower produced marginal costs per kilowatt-hour for each pricing period, from which in turn he developed his seasonally differentiated residential rates.[64]

The Commission agreed that, *on average,* providing service is more costly during the winter months. It concluded, however, that it lacked sufficient information to establish

---

**62.** The minimum intercept method, based upon average installed book cost of plant items, is considered somewhat inaccurate in times of inflation. *NARUC Manual* at 56.

**63.** Doctor Bower's calculations produced a seasonal difference in costs per Kwh of more than 2 cents, finding costs to be 6.42 cents/Kwh in winter and 4.04 cents/Kwh in non-heating season.

**64.** Doctor Bower's study yielded a winter rate with a monthly customer charge of $4.00 and an energy charge of 4.46 cents per kilowatt-hour, and a non-heating season rate with the same $4.00 customer charge and an energy charge of 2.58 cents per kilowatt-hour.

seasonally differentiated rates which would be equitable in individual cases. The NERA study on which Doctor Bower relied did not attempt to break down the variations in marginal costs *during* the broad winter pricing period. Rather, it computed only *average* costs which are subject to considerable fluctuation depending upon the day of the week and the time of day. Consequently, although on average the costs of producing electricity during the heating season are higher, the Commission recognized that at many hours during that season the costs may actually be lower than during some hours of the non-heating season. Without this more detailed breakdown of costs, the Commission was concerned that the seasonal rate could be a shotgun approach, and declined to adopt it:

> *We reject Dr. Bower's proposed seasonal rate because we find that there is a substantial likelihood that many customers would be penalized in excess of the costs they actually impose on the system. Rates that vary by season, in conjunction with rates that vary by time-of-day, may be the best way to reflect the actual cost of service. However, there are certainly many hours during the winter months which should properly be characterized as off-peak hours. Unless and until time-of-day rates are available for all customers, a seasonal rate would unfairly charge on-peak rates for a considerable amount of off-peak use.*

Given more information, the Commission now argues, seasonal rates might be an appropriate method of reflecting cost differences. However, it continues, on the state of the record here, the Commission acted within its discretion in refusing to implement a seasonal rate.

The Natural Resources Council assails the Commission rationale, contending that the NERA study was far more comprehensive than the Commission admits, producing costs measured both seasonally and on an on-peak and off-peak daily basis, year round. Recognizing that it suffers from the limitation of being unable to precisely monitor the specific performance of specific customers as an ideal time-of-use rate structure would, the Council urges that the same limitation applies to the flat-rate structure adopted by the Commission, and that the Commission erred in not choosing the structure (i. e., seasonally differentiated) that would have minimized the discrimination the Commission found to be imposed on low and medium residential users in the form of a subsidy to heavy users. Even if, the Council says, the costs are only averages, they do vary seasonably, and the Commission itself has decreed that averages must sometimes be employed where greater precision is unattainable. Further, the principal rationale offered by Central Maine Power on this issue—that a lower summer rate could increase demand at that time, and interference with scheduled generator maintenance—was considered by NERA in producing its study, and the experience of the Central Vermont Company (an electric utility) with a seasonal differential produced no suggestion of maintenance difficulties. Finally, the Council points to, *inter alia*, the *Maine Electric Rate Reform Act*, 35 M.R.S.A. §§ 91 *et seq.* (1977) and the federal *Public Utility Regulatory Policies Act of 1978* (PURPA), P.L. 95–617, 92 Stat. 3117 (*U.S.Code Cong. & Admin.News* 1978, p. 7659) as establishing policies mandating implementation of such ratemaking techniques as seasonal differentials. The rejection of Doctor Bower's proposal, the Council concludes, was based on unsupported speculation as to its potential for error, and was arbitrary and capricious.

Once more we are plunged into the thicket of the rate design briar patch. Once more we conclude that the Commission acted within its discretion, with a methodology and result that is reasonable and supported by substantial evidence.

Initially we note that the result—a failure to adopt seasonally differentiated rates—derives some aura of reasonableness from the bare fact that a contrary decision would have been unprecedented. Seasonally differentiated rates have never been implemented in this jurisdiction, and one alleging that the failure to do so is in itself

unreasonable shoulders not only the ordinary burden of the appellant but the weight of past practice. While tradition alone will not save unreasonable conduct, the unreasonableness of a historically accepted practice in the circumstances under consideration must be shown. *See Central Maine Power Company v. Public Utilities Commission, supra,* 382 A.2d 302 at 328, n. 39.

Several witnesses testified as to the proper rate design; only Doctor Bower recommended a seasonal rate. Central Maine Power's Anderson rejected a seasonal differential on the basis of the necessity for summer maintenance noted above; we do not find the evidence on that facet of the issue conclusively supportive of either position, nor does it appear that the Commission necessarily assigned any significance to it. Doctor Wilson specifically rejected use of a seasonal differential for several reasons, including the relatively small winter-summer peak differential, the scheduled maintenance problem, and Central Maine Power's responsibilities as part of NEPOOL. In abbreviated form his testimony was that:

> On the Central Maine Power Company system, I've not made any seasonal differential. That's kind of unusual. Normally, in a situation like this I would recognize a seasonal differential. There are several reasons for not doing it. One, the winter peak and the summer peak tend to be pretty close together with each other.
>
> . . . . .
>
> Moreover . . . there's reason to believe—that the excess capacity during the off peak periods and particularly during the spring and the fall is necessary for planned maintenance anyway . . . .. there's not so much of that off peak time

that it would appear obvious to me that an off peak rate ought to be charged.

> . . . . .
>
> Moreover, we've got another complication . . . [i. e.] whether or not the rates for the Central Maine system ought to reflect NEPOOL peaks and whether they ought to reflect peaks in Maine. . . . Well, as it turns out, other than the seasonal differential between CMP and NEPOOL the daily loads look pretty much the same. On a daily basis we don't have terribly much in the way of complication as to whether we ought to use CMP or NEPOOL.
>
> . . . . .
>
> [G]iven the fact that the summer peak is nearly as great as the winter peak, given the fact that the off peak periods are needed for system maintenance and given the fact that NEPOOL doesn't have the kind of winter peaks that the CMP systems has, I thought that the most direct—certainly the least complex and perhaps the most accurate way of designing rates was to impose no seasonal differential at all.

Doctor Bower referred on several occasions to the experience of Central Vermont Company under a seasonally differentiated rate. As Central Maine points out, however, Central Vermont's winter/summer peak differential has historically been much larger than Central Maine's and as of the 1977 test year was still slightly above Central Maine Power's.[65] The impact of a seasonal rate in leveling the differential could be expected to be far less in the case of Central Maine Power than in the Vermont experience; moreover, the perceived necessity for a leveling would be correspondingly reduced.

| YEAR | WINTER/SUMMER PEAK LOAD DIFFERENTIAL |
|------|--------------------------------------|
| 1975–1979 | 22.6 |
| 1980–1984 | 24.0 |

By comparison, Central Vermont's differentials were: 12.2 in 1961, 40.7 in 1971, 39.1 in 1972. After implementation of a seasonal rate, the differential has been reduced to 30.2 in 1976 and 24.4 in 1977, a level still above Central Maine Power's current differential of approximately 22% to 23%.

---

**65.** Doctor Bower's historic and projected load differentials for Central Maine Power were as Follows:

| YEAR | WINTER/SUMMER PEAK LOAD DIFFERENTIAL |
|------|--------------------------------------|
| 1960–1964 | 10.8% |
| 1965–1969 | 11.2 |
| 1970–1974 | 16.2 |

**194**

The Commission's conclusion that the risks of a seasonal rate outweighed the prospective advantages is buttressed by these distinctions between the comparative problems and potential gains of the utilities involved. Perhaps the Commission would have considered the risks it foresaw in a seasonal rate worth undertaking had Central Maine's seasonal differential like Central Vermont's, hovered around 40 percent. We cannot so determine, but we can evaluate the shortcomings of evidence supporting a seasonal rate in determining whether the Commission's rejection of it was erroneous as a matter of law.

The citation by the Council of state and federal legislation establishing policies variously urging and mandating consideration of more clearly cost-based rate designs and structures does not suggest unlawful Commission action. The Maine Electric Rate Reform Act specifically states that the Commission is *"authorized"* to implement experimental or other reforms *"as* [it] *may determine is appropriate,"* 35 M.R.S.A. § 94. Similarly, the Public Utility Regulatory Policies Act requires state regulatory commissions to *"consider"* such standards as seasonal rates, and determine *"whether or not it is appropriate to implement such* [a] *standard . . ."* § 111(a); *See also H. Conf. Rep.* No. 95–1750. The Act, as the Council concedes, was not signed into law until nearly a month after the Commission's Decree in this case, and allows commissions three years to consider the implementation of the *"standards"* set forth therein. § 111(b). The question, the Council says in its reply brief, is not whether the Commission has violated any specific directive of PURPA, but whether it violated its policy in declining to adopt seasonal rates. On the basis of this record, we cannot find such a violation. The Commission made its decision after hearing conflicting evidence as to the propriety of seasonal rates. In choosing the more conservative path of declining to adopt seasonal rates without further assurances of precision in tracking actual costs, it was faithful to its obligation to make no findings without substantial evidence.

We deny the appeal of the Natural Resources Council of Maine as to this issue.

The entries are:

1. As to Central Maine Power Company: Section 303 appeal denied in part and sustained in part.

Section 305 complaint granted in part and denied in part.

Judgment for defendant on Section 305 complaint as respects the capital structure issue, for plaintiff as respects remaining issues.

Appeal from Superior Court denied as moot.

2. As to Intervenors St. Regis Paper Company, Consumer Action Coalition, and Natural Resources Council of Maine, *et al.*: Section 303 appeals denied.

Remanded to the Public Utilities Commission for further proceedings consistent with this opinion.

McKUSICK, C. J., and DELAHANTY, J., did not sit.

WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ., concurring.